PEOPLE v MITCHELL

Docket Nos. 98984, 98985. Argued October 8, 1996 (Calendar No. 5). Decided March 25, 1997.

Charlie L. Mitchell was convicted in the Detroit Recorder's Court, Samuel A. Turner, J., of second-degree murder. The Court of Appeals, SAWYER, P.J., and WEAVER and H. R. GAGE, JJ., in an unpublished opinion per curiam, affirmed the conviction, but reversed the sentence imposed on the basis of a scoring error under the sentencing guidelines and remanded for resentencing (Docket Nos. 118832, 121158). The defendant appeals.

In an opinion by Justice BOYLE, joined by Justices BRICKLEY and RILEY, the Supreme Court held:

1. A thirty-day suspension of trial counsel during a seven-month period of representation is not a circumstance making it so unlikely that any lawyer could provide effective assistance that a total or constructive denial of counsel occurred. Examination of the actual performance of counsel and prejudice is required.

2. The defendant was not deprived of the effective assistance of counsel. The defendant failed to overcome the presumption that counsel's performance was reasonable or to show that the deficiencies alleged prejudiced the outcome of his trial. In determining whether a defendant was deprived of the effective assistance of counsel, the reviewing court must determine whether counsel's performance was objectively unreasonable, and whether the defendant was prejudiced by counsel's defective performance. Defendant's claims of ineffective assistance fail on both scores.

3. Review of a sentence is available to the prosecution on the same terms as the defense. MCL 770.12; MSA 28.1109 expressly provides for prosecutorial appeals of right and by leave if the protection against double jeopardy under the state and federal constitutions would not bar further proceedings against the defendant. The statute was enacted to give the people the same essential right to appeal and seek leave as the defendant enjoys, within the limits of the constitutional prohibition against double jeopardy.

4. Because the sentencing guidelines do not have the force of law, the Court of Appeals erred in ordering resentencing on the basis of a scoring error. A scoring error does not violate the law. A

claim of a miscalculated variable in itself is not a claim of legal error. The challenge asserted in this case is directed not to the accuracy of the factual basis for the sentence, but, rather, to the court's calculation of the sentencing variable on the basis of its discretionary interpretation of the unchallenged facts. It does not state a cognizable claim for relief. Appellate courts are not to interpret the guidelines or to score and rescore the variables for offenses and prior record to determine if they were correctly applied. Guidelines are tools to aid the trial court in the exercise of its authority and a framework for the appellate courts' inquiry into the question whether the sentence is disproportionate and, hence, an abuse of the trial court's discretion.

Affirmed in part and vacated in part.

Chief Justice MALLETT, dissenting, stated that the specific facts of the case justify a presumption of ineffectiveness without inquiry into actual performance or prejudice of counsel.

Where surrounding circumstances make it so unlikely that any lawyer could provide effective assistance, ineffectiveness may be presumed without inquiry into actual performance or prejudice. The circumstances surrounding the defendant's representation precluded crucial trial preparation. The criminal justice and attorney disciplinary systems, without a doubt, combined to deny the defendant any assistance of counsel for a full thirty-four days leading to his trial. This denial was especially egregious because counsel had not previously conducted a private in-depth interview with his client to hear his account of the first-degree murder charge and because challenges to the admissibility of evidence had not been addressed and res gestae witnesses had not been contacted. This was not an instance where counsel chose to take no action. Rather, because of the circumstances of counsel's disciplinary suspension before trial and the trial court's refusal to assist the defendant in obtaining substitute counsel at that time, the defendant was denied his Sixth Amendment right to counsel during the critical pretrial period.

The record also does not support a knowing and intelligent waiver of counsel during the pretrial period. The defendant's subsequent expression of satisfaction with his counsel cannot be construed as a valid waiver of counsel. His motion for substitute counsel and his grievance regarding counsel's lack of pretrial representation clearly put the court on notice that he was not receiving the assistance of counsel during the critical pretrial period. A defendant's expression of satisfaction with counsel's performance at the time of trial or a later expression of dissatisfaction is not determinative of an ineffective assistance claim.

Justice CAVANAGH, dissenting, concurred with Chief Justice MALLETT and noted disagreement with Justice BOYLE's discussion of sentencing guidelines.

Justices WEAVER and KELLY took no part in the decision of this case.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Jeffrey Caminsky*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Rolf E. Berg*) for the defendant.

BOYLE, J. We granted leave to appeal to address whether defendant was denied his right to counsel, whether review of a defendant's sentence is available to the prosecution, and, if so, whether the Court of Appeals erred in ordering resentencing on the basis of a scoring error under the sentencing guidelines. An inference of ineffectiveness and prejudice on the basis of a thirty-day disciplinary suspension in a seven-month period of representation would violate controlling precedent of the United States Supreme Court and of this Court. Sixth Amendment claims based on defective performance must be established by showing constitutionally defective performance that undermines the reliability of the result. We hold that defendant has failed to overcome the presumption that counsel's performance was reasonable or to show that the deficiencies alleged prejudiced the outcome. We also hold that review of a sentence is available to the prosecution on the same terms as the defense. Therefore, because the guidelines do not have the force of law, the Court of Appeals erred in

ordering resentencing on the basis of a scoring error under the Michigan Sentencing Guidelines.[1]

We vacate the order of remand and affirm the decision of the Court of Appeals in all other respects.

## I. FACTS

On October 3, 1988, decedent Raymond Harlin was the victim of an altercation that took place in defendant Charlie Mitchell's apartment. Mr. Harlin was beaten with fists, a blackjack, brass knuckles, a baseball bat, and a woodcarving knife before he was shot. He jumped out the window of the third floor apartment and took a cab to Henry Ford Hospital where he died. The cause of death was gunshot wounds to the neck and back.

Defendant was charged with first-degree murder. MCL 750.316; MSA 28.548. Gerald Evelyn was appointed counsel for Mr. Mitchell on October 6, 1988, and represented him at the preliminary examination, on October 14, 1988. At the preliminary examination, the prosecution called Tyrone Thompson, and Mr. Evelyn actively interposed objections during his testimony and argued against the bindover. Mr. Evelyn represented defendant at the final conference on February 3, 1989. On April 5, six months after appointment, Mr. Evelyn received a disciplinary suspension which expired May 5, 1989.

---

[1] We do not reach defendant's claim that the trial court erred in modifying the sentence under *People v Tanner*, 387 Mich 683; 199 NW2d 202 (1972). The issue was not preserved below. Moreover, we agree with the Court of Appeals that pointing out what appeared at the time to be two options and advocating the one favorable to the defendant is not ineffective assistance. See *McMann v Richardson*, 397 US 759, 774; 90 S Ct 1441; 25 L Ed 2d 763 (1970). Because *People v Thomas*, 447 Mich 390; 523 NW2d 215 (1994), had not yet been decided, there was no clear rule prohibiting correction of a *Tanner* error by increasing the maximum term.

Trial began on May 8, 1989. Tyrone Thompson testified as he had at the preliminary hearing that defendant was the leader of a drug ring and gave the order to shoot Mr. Harlin, which was carried out by codefendant Lamont Mason. Defendant Mitchell did not take the stand, and counsel contended in closing argument that Mr. Thompson's testimony that defendant ordered the killing was equivocal and that the prosecution had failed to carry the burden of proof beyond a reasonable doubt.

Before trial, defendant wrote six letters to the trial judge, the chief judge, and others, requesting removal of counsel. Defendant complained that Mr. Evelyn had not visited him at the Wayne County jail, instead only meeting with him in the "bullpen" at the Recorder's Court. Defendant also believed that there were certain motions that Mr. Evelyn needed to make before the time to do so expired. On April 27, 1989, eleven days before jury selection was to begin, defendant appeared before the court in propria persona for a hearing on defendant's "motion for withdrawal of counsel." Defendant informed the judge on the record that he did not believe counsel was responsive to his concerns, and that counsel had been suspended from practice for thirty days from April 5, 1989, to May 5, 1989.[2] Counsel was officially reinstated on May 8, 1989, the day jury selection in defendant's trial began. That day, Mr. Evelyn advised the court that defendant wanted him removed and had filed a grievance against him. Counsel did not indicate that he was unprepared.

---

[2] Defendant had been notified by Mr. Evelyn and advised to contact counsel's partner, Myzell Sowell.

The judge had taken the April 27 motion under advisement pending receipt of a response from Mr. Evelyn. The issue was revisited on Tuesday, May 9, the second day of jury selection. Mr. Evelyn advised the court that "as of yesterday evening," at the conclusion of proceedings, defendant was satisfied with his representation; but, because he had been unable to visit him in the jail that evening, defendant would like him removed as counsel. Mr. Evelyn stated that he had talked with defendant on numerous occasions. The court found nothing that would warrant a change of counsel, nor would the court "abort" the proceedings.

The defendant confirmed that he had received copies of the prosecutor's file in the instant case and another pending case and his transcripts[3] in March, but stated that counsel's failure to discuss matters with him had led to specific deficiencies, which he detailed. The court directed counsel to confer with defendant and to evaluate and report back regarding any motions defendant might wish to be heard, and Mr. Evelyn's professional opinion regarding whether they were appropriate. The motion was denied without prejudice.

Thereafter, the defendant's concerns over evidence seized at the apartment building from apartment 302,[4] and the validity of the search warrant with regard to apartment 302 were resolved to defendant's satisfaction with a stipulation in which the parties agreed that none of the evidence from apartment 302 except the weapons involved would be admitted. Defendant

---

[3] Presumably the transcript of the preliminary hearing.

[4] Defendant resided in apartment 301; 302 was vacant.

also expressly waived his right to a *Walker*[5] hearing for the purpose of suppressing his statement. On Monday, May 15, 1989, Mr. Evelyn informed the court that he had received a grievance filed by the defendant on May 1. Defendant stated he was satisfied with counsel's resolution of his concerns and wanted to withdraw the grievance.[6]

Following defendant's conviction on May 17, 1989, of second-degree murder,[7] MCL 750.317; MSA 28.549, defendant appealed, and the Court of Appeals remanded the case for a *Ginther*[8] hearing. Trial counsel was not called as a witness, and the trial court held that defendant had not shown objective unreasonableness, or prejudice as required by *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994). Thereafter, the Court of Appeals affirmed defendant's conviction, and on the cross appeal by the people, found error in the scoring of certain offense variables under the sentencing guidelines in which ten points had

---

[5] *People v Walker*, 374 Mich 331; 132 NW2d 87 (1965).

[6] The grievance was filed on May 1, 1989, before Mr. Evelyn had resolved defendant's concerns to defendant's satisfaction. In response to the judge's inquiry with regard to the grievance that had precipitated a motion to withdraw by Mr. Evelyn, defendant stated, "I would like to, you know, cancel that grievance, you know, because all the motions and everything that I requested have been answered. . . . I'm satisfied [with counsel], your Honor." This expression of satisfaction is not a waiver of a claim of ineffective assistance of counsel. Because the appropriate inquiry is not the client's evaluation of counsel's performance, but rather whether counsel is a reasonably effective advocate, "we attach no weight to either respondent's expression of satisfaction with counsel's performance at the time of his trial, or to his later expression of dissatisfaction." *United States v Cronic*, 466 US 648, 657, n 21; 104 S Ct 2039; 80 L Ed 2d 657 (1984).

[7] The judge sentenced defendant to ten to twelve years; two months later, the judge increased the sentence to ten to fifteen years to correct the error under *People v Tanner*, n 1 *supra*.

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

been allocated under offense variable three—"Intent to Kill or Injure" (OV 3), and zero points under offense variable four—"Aggravated Physical Injury" (OV 4). The Court of Appeals ordered the case remanded to the trial court for resentencing consistent with the panel's rescoring of twenty-five points on OV 3 and twenty-five points on OV 4. Defendant sought leave to appeal his conviction and the order of remand in this Court.

We granted leave, limiting the issues to whether defendant was denied counsel or effective assistance and whether and to what extent a prosecutor may appeal sentencing errors. 450 Mich 993 (1996).

## II. THE RIGHT TO COUNSEL: GOVERNING PRINCIPLES

"It has long been recognized that the right to counsel[9] is the right to the effective assistance of counsel." *McMann v Richardson*, 397 US 759, 771, n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970). However, because "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial, [a]bsent some effect of [the] challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *United States v Cronic*, 466 US 648, 658; 104 S Ct 2039; 80 L Ed 2d 657 (1984).

---

[9] The right to counsel extends to representation during any "critical stage" of the proceedings, *Coleman v Alabama*, 399 US 1, 7; 90 S Ct 1999; 26 L Ed 2d 387 (1970), and guarantees "a fair trial and a competent attorney." *Engle v Isaac*, 456 US 107, 134; 102 S Ct 1558; 71 L Ed 2d 783 (1982). It does not require the state to provide the defendant with unlimited access to the attorney during the trial. See, e.g., *Perry v Leeke*, 488 US 272; 109 S Ct 594; 102 L Ed 2d 624 (1989). A fortiori, it does not guarantee a defendant "a private in-depth interview" during pretrial in the place of the defendant's choosing. *Post* at 191.

The cases interpreting the right to the meaningful assistance of counsel as it affects the right to a fair trial, "present a continuum." *United States v DeCoster*, 199 US App DC 359, 364; 624 F2d 196 (1976). Cases on the continuum proceed from "structural or procedural impediments by the state that prevent the accused from receiving the benefits of the constitutional guarantee," *id.*, to cases where the "issue is counsel's performance when he is 'untrammelled and unimpaired' by state action." *Id.* at 365. The companion cases of *Cronic* and *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), reflect this continuum.

### CRONIC[10]

Cases on the continuum range from actual to constructive denial of counsel to instances where the performance of counsel is so deficient that there has been a functional denial of counsel guaranteed by the Sixth Amendment. The methods of analysis employed to determine whether there has been a denial of the constitutional right likewise range from the general to the particular. *Cronic* reviews the cases in which the courts have found a Sixth Amendment

---

[10] We need not dispute the fact that some circumstances, like those in *Powell v Alabama*, 287 US 45; 53 S Ct 55; 77 L Ed 158 (1932), are so egregious that prejudice will be presumed. See, e.g., *Childress v Johnson*, 103 F3d 1221 (CA 5, 1997). In *Childress*, the court observed that "federal courts of appeal . . . have repeatedly emphasized that constructive denial of counsel as described in *Cronic* affords only a narrow exception to the requirement that prejudice be proved." *Id.* at 1228-1229. *Cronic's* reservation of the constructive denial of counsel rule to cases where the "circumstances . . . are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," *id.* at 658, has been applied only in a "narrow spectrum" of cases where the "circumstances . . . [were] so egregious that the defendant was in effect *denied any meaningful assistance at all." Childress* at 1229 (emphasis added).

violation without inquiry into whether the outcome was reliable. "The most obvious example is, of course, the failure of the state to provide any counsel whatever." *DeCoster* at 364; see also *Cronic* at 659 ("a trial is unfair if the accused is denied counsel at a critical stage of his trial"). Equally obvious would be the case in which counsel is provided but does nothing, that is, "no actual 'Assistance' 'for' the accused's 'defence' is provided," in that "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing . . . ." *Cronic* at 654, 659. A prophylactic approach also has been applied to cases in which the court or the state directly interferes with the attorney-client relationship by preventing counsel from rendering assistance. See, e.g., *Geders v United States*, 425 US 80; 96 S Ct 1330; 47 L Ed 2d 592 (1976) (order prohibiting counsel from conferring with defendant during overnight recess while defendant was testifying); *Crutchfield v Wainwright*, 803 F2d 1103 (CA 11, 1986) (*en banc*) (order denying right to confer during trial recess).[11] Because these "circumstances . . . are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," courts are "require[d] . . . to conclude that a trial [under such circumstances] is

---

[11] See also *Ferguson v Georgia*, 365 US 570; 81 S Ct 756; 5 L Ed 2d 783 (1961) (statute barring direct examination of defendant and requiring defendant to testify in an unsworn statement); *Brooks v Tennessee*, 406 US 605; 92 S Ct 1891; 32 L Ed 2d 358 (1972) (statute allowing judge in a bench trial to preclude closing argument by defense). Such proceedings give rise to a prophylactic approach because they "impair the accused's enjoyment of the Sixth Amendment   guarantee by disabling his counsel from fully assisting and representing him." *DeCoster* at 364. *Cronic*, however, rejects the extension of this approach where, as here, the claim is that counsel's preparation was inadequate. *Id.* at 667.

unfair . . . ." *Cronic* at 658-659. In these cases, prejudice is presumed. *Id.*

Next on the continuum are the rare cases in which the circumstances are such that "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic* at 659-660; *Powell v Alabama,* 287 US 45; 53 S Ct 55; 77 L Ed 158 (1932). As in instances where the state has by statute or order interfered with the attorney-client relationship, the inquiry focuses not on counsel's performance at trial, but on whether the surrounding circumstances are so likely to have prejudiced the accused that particularized inquiry into the fairness of the result is unjustified. Where the circumstances are not of such "magnitude," *Cronic* at 659, n 26, that there has been an "actual breakdown of the adversarial process during the trial of the case," *id.* at 657-658, a defendant "can . . . make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel." *Id.* at 666. Thus, at the far end of the continuum opposite an actual denial of counsel are those cases in which the "issue is counsel's performance." *DeCoster* at 365. Here, the inquiry is particular, not general, and the question is whether counsel's actual performance undermines confidence in the reliability of the result.

### STRICKLAND/PICKENS

The benchmark case describing the standard for claims of actual ineffective assistance of counsel in Michigan is *People v Pickens, supra* at 318, which

held that the right to counsel under the Michigan Constitution does not justify a more restrictive standard than that applied under the United States Constitution and adopted the Supreme Court's test in *Strickland*. That test requires the greatest level of factual inquiry into the actual conduct of the defense and its effect on the outcome of the trial. It places the burden on the defendant to show, with regard to counsel's performance,

> that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment . . . [and] that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. [*Strickland* at 687.]

In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689. Whereas cases at the other end of the continuum indulge a presumption that defendant was prejudiced by counsel's absence or inertness, or by state interference or other surrounding circumstances as egregious as those found in *Powell*, cases decided under the *Strickland/Pickens* test require the *defendant* to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland* at 689.

### III. APPLYING *CRONIC*

The defendant argues, and the dissent agrees, that a thirty-day suspension of trial counsel during a seven-month period of representation is a circumstance making it so unlikely that *any* lawyer could provide effective assistance that "a total denial of counsel during the critical pretrial period" occurred, *post* at 191.[12] However, in *Cronic, supra,* the Court distinguished cases recognizing a presumption of prejudice from claims of ineffective assistance based on defects in performance grounded in allegations of inadequate preparation. The Court rejected the prophylactic approach and held that such claims and other specific claims of a given lawyer's incompetence at trial either individually or in combination did not justify an inference that the right to counsel had been violated.

> Under the test employed by the Court of Appeals, reversal is required even if the lawyer's actual performance was flawless. By utilizing this inferential approach, the Court of Appeals erred. [*Id.* at 652-653.]

In *Strickland,* in which the claims of defective performance included, inter alia, counsel's failure to investigate and present character witnesses, Justice O'Connor set forth the test applicable to such a claim. As noted above, the *Strickland* test applied in Michigan requires that a defendant claiming ineffective assistance based on defective performance has the

---

[12] The dissent believes "the suspension, combined with the surrounding circumstances and the gravity of the charge justify a presumption of prejudice," *post* at 193, thus arguing that the case belongs with *Powell* on the continuum. We disagree because the type of presumption alluded to is reserved for cases, like *Powell,* in which the circumstances are far more egregious than those presented here.

burden of showing that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for the unprofessional errors the result of the proceeding would have been different.

The Supreme Court has rejected a categorical prophylactic approach to claims of counsel's deficient performance and of failure to adequately prepare or investigate in favor of an inquiry into actual performance and prejudice. As Professors LaFave and Israel have noted, "If the Supreme Court had not clearly so indicated [previously], its subsequent opinions in . . . *Cronic* and *Strickland* . . . established without doubt its rejection of any such across-the-board categorical approach." 2 LaFave & Israel, Criminal Procedure, § 11.7, p 25 (1991 Supp). "Read in conjunction with *Cronic, Strickland* leaves no doubt that a strictly judgmental approach applies to ineffectiveness claims based upon the incompetent performance of counsel." *Id.*, § 11.10 at 45. To justify reversal under both the United States and Michigan Constitutions, defendant must affirmatively demonstrate that counsel's performance was objectively unreasonable and so prejudicial as to deprive him of a fair trial.

The dissent attempts to avoid application of this precedent by relying on the examples given in *Cronic* of cases in which prejudice is presumed and variously characterizing the claim as a circumstance making it unlikely that any lawyer could provide effective representation, as a constructive denial of counsel, or as a denial of counsel combined with a failure to grant a continuance. Dealing with the theories in inverse order, *Morris v Slappy*, 461 US 1; 103 S Ct 1610; 75 L Ed 2d 610 (1983), demonstrates that the suggestion

that defendant's right to counsel was violated because the trial court should have granted a continuance[13] is error. In *Morris*, the defendant claimed a constitutional violation in the trial court's failure to grant a continuance when his original assigned counsel was scheduled for surgery and new counsel was substituted six days before the trial. The court of appeals held that the defendant's Sixth Amendment right to counsel had been violated and that this violation required reversal without any showing of prejudice. The Supreme Court reversed, finding that the court of appeals had "misread the record and the controlling law and announced a new constitutional standard which is unsupported by any authority." *Id.* at 12. Importantly to resolution of the instant case, the Supreme Court observed that

> [n]ot every restriction on counsel's . . . opportunity to investigate . . . or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. . . . [O]nly an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel. [*Id.* at 11-12.]

To the extent that the dissent characterizes Mr. Evelyn's thirty-day suspension as an external constraint constituting a constructive denial of counsel, the conclusion is refuted by *Cronic*, on which the dissent purports to rely. The Court overturned the court of appeals decision in *Cronic*, which held precisely, as would the dissent here, that "when circumstances hamper a given lawyer's preparation of a defendant's case, the defendant need not show specified errors in

---

[13] As in *Morris*, the request was made not by counsel, but by the defendant.

the conduct of his defense in order to show ineffective assistance of counsel." *United States v Cronic*, 675 F2d 1126, 1128 (CA 10, 1982). The Supreme Court expressly held that the Tenth Circuit Court had erred in finding that claimed external constraint on a given lawyer's trial counsel's performance—the district court's decision to give counsel only twenty-five days to prepare for trial—created an inference of ineffectiveness and that reversal was required.

> The fact that the accused can attribute a deficiency in his representation to a source external to trial counsel does not make it any more or less likely that he received the type of trial envisioned by the Sixth Amendment, nor does it justify reversal of his conviction absent an actual effect on the trial process or the likelihood of such an effect. [*Cronic*, 466 US 662, n 31.]

The Court in *Cronic* also specifically found that allegations of deficient performance due to allegedly inadequate time to prepare were not the type of circumstances justifying a presumption of prejudice as in *Powell v Alabama*,[14] and specifically observed that the case did not involve a finding that the defendant

---

[14] The defendants in *Powell* had no counsel until the morning of trial, when an attorney from another state, who was unfamiliar with Alabama procedure, acknowledged his willingness to provide representation despite his unpreparedness. *Id.* at 57.

The dissent's application of *Powell* to defense counsel's thirty-day suspension is factually inapt. Four young, ignorant, and illiterate "negroes" were arrested by an Alabama sheriff's posse for the rape of two white girls in 1931, were brought to town into the midst of a hostile crowd, and "every step taken from the arrest and arraignment to the sentence was accompanied by the military . . . in an atmosphere of tense, hostile, and excited public sentiment." *Id.* at 51. None of the defendants was a resident of Alabama, and the trial court never inquired whether they had counsel, the ability to obtain counsel, or needed counsel appointed. *Id.* at 52. The trial court appointed for arraignment "all the members of the [Alabama] bar" to assist in the defense. *Id.* at 49.

was deprived of the presence of counsel at a critical stage of the trial. *Cronic* at 664. Neither *Cronic* nor this case involves a total denial of counsel during a critical stage of the proceedings or interference by the trial court with the attorney-client relationship.[15] *Geders, supra*. The Court concluded that allegations of inadequate preparation and investigation under the Sixth Amendment arising from the court-imposed twenty-five days to prepare did not "even arguably" justify a presumption of inability to prepare to meet the bona fide issue of criminal intent. *Cronic* at 664. Likewise, an allegation of deficient performance stemming from a thirty-day suspension coupled with six-months time for preparation does not justify a pre-

---

The defendants were hurried to trial with counsel who had no opportunity to prepare or investigate. The Court found that counsel's representation then proceeded "pro forma," so that the "defendants were not accorded the right of counsel in any substantial sense." *Id.* at 58. The Court reasoned that

> during perhaps the most critical period of the proceedings against these defendants, that is to say, *from the time of their arraignment until the beginning of their trial*, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself. [*Id.* at 57 (emphasis added).]

[15] Defendant was not unrepresented during any critical stage of the proceedings. Defendant was represented at the preliminary examination, during trial, and during all critical stages through sentencing. In fact, given Mr. Sowell's assumption of the case, there was no period of time when the defendant was not represented. Counsel was not absent at any specific time when " 'counsel's absence might derogate from the accused's right to a fair trial[,]' . . . as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." *Coleman*, n 9 *supra* at 7 (citations omitted). Even if defendant and his mother were fully creditable and Mr. Evelyn did not contact the witnesses and only met with the defendant three times, this is not a "denial of counsel" during a critical stage. Rather, these are allegations of deficient performance by counsel that must meet the *Strickland* standard.

sumption.[16] These are not circumstances making it so likely that "no lawyer could provide the respondent with the effective assistance of counsel required by the Constitution," *id.*, that examination of the actual performance of counsel or prejudice is irrelevant.[17]

### IV. APPLYING *STRICKLAND*

#### A. THE *GINTHER* EVIDENCE

There is no factual basis for a conclusion that counsel's performance was constitutionally deficient

---

[16] Given the dissent's recognition that a *Powell*-like presumption obviating an inquiry into actual performance or prejudice applies "[w]hen the surrounding circumstances make it so unlikely that *any* lawyer could provide effective assistance" *post* at 186 (emphasis added), the fallacy in applying *Powell* to a thirty-day period of assumed lack of preparation during a seven-month period of representation is obvious. Would *any* lawyer who had represented the defendant at the examination, had the benefit of discovery, and six-months time to prepare necessarily be ineffective to try this relatively uncomplicated five-day trial if illness had precluded preparation for trial for the thirty-day period preceding trial, if a family emergency had absorbed all time and energy for that period, or, more realistically, if the demands of another, more complex trial had prevented preparation?

[17] While the dissent states that "the criminal justice and attorney discipline systems, without a doubt, combined to deny Mr. Mitchell any assistance of counsel," *post* at 190, the disciplinary system is not the creature of the criminal justice system, and neither the government nor the trial court has control over or responsibility for the timing of an order of discipline. Nonetheless, to the extent that the dissent views the situation as analogous to a statute or order which impairs the attorney-client relationship, we note that there is no claim that the order disabled counsel from fully representing him at trial. The interests of both systems as well as those of criminal defendants require that a claim of ineffective assistance based on specific deficiencies of counsel stemming from disciplinary action be treated as a claim that, by its "very nature, require[s] courts to evaluate the attorney's performance and the effect of that performance on the reliability and fairness of the proceeding." (Brennan, J., concurring in *Strickland* at 702) (that claims of specific attorney error were not "cases 'in which the surrounding circumstances [make] it so unlikely that any lawyer could provide effective assistance that ineffectiveness [is] properly presumed without inquiry into actual performance at trial' ").

and undermines confidence in the reliability of the verdict.

> "A convicted person who attacks the adequacy of the representation he received at his trial must prove his claim. To the extent his claim depends on facts not of record, it is incumbent on him to make a testimonial record at the trial court . . . which evidentially supports his claim and which excludes hypotheses consistent with the view that his trial lawyer represented him adequately." [*People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).]

No record was made regarding what Mr. Evelyn did or did not do, or whether Mr. Evelyn knew of the alleged eyewitnesses.[18] Counsel's failure to call witnesses is presumed to be trial strategy, *Strickland, supra; Ginther, supra,* and Mr. Evelyn was not called to testify at the *Ginther* hearing. Testimony of the three witnesses who were found by the trial court to be "inconsistent and contradictory of one another" did not exclude the hypotheses of adequacy.

The dissent offers no support for the conclusion that there was any legally viable challenge to the admissibility of the evidence,[19] and the witnesses subject to being called were not eyewitnesses. While the dissent concludes that Mr. Evelyn failed to investigate and that "no reasonable trial strategy exists" for this "failure," *post* at 189, n 4, the dissent offers no analysis with respect to how these witnesses might have made a difference at trial.

---

[18] Although Mr. Evelyn stated at trial that he had met with the defendant on numerous occasions and more than once at the courthouse, the dissent accepts, without any testimony from Mr. Evelyn at the *Ginther* hearing, defendant's allegation that the meetings were useless because he was hard of hearing.

[19] As in *Cronic*, competent appellate counsel has failed to identify any bona fide grounds to suppress the evidence.

> [T]he Sixth Amendment does not require that counsel do
> what is impossible or unethical. If there is no bona fide
> defense to the charge, counsel cannot create one and may
> disserve the interests of his client by attempting a useless
> charade. [*Cronic* at 656, n 19.]

The only bona fide jury issue open to competent defense counsel on these facts was that the government's witnesses were unworthy of belief and that the state had failed to carry the burden of proof.[20] This is precisely what Mr. Evelyn argued,[21] an argument that persuaded the trial court to direct a verdict on first-degree murder.[22]

### B. PERFORMANCE/PREJUDICE

In *Pickens*, we adopted the test set forth by the United States Supreme Court in *Strickland*. The reviewing court is to determine (1) whether counsel's performance was objectively unreasonable, and (2) whether the defendant was prejudiced by counsel's defective performance. *Id.* at 687. The first prong requires that counsel make "errors so serious that counsel was not functioning as the 'counsel' guaran-

---

[20] The dissent argues that the testimony of the witnesses offered at the *Ginther* hearing could have been useful to undermine Mr. Thompson's testimony. *Post* at 194, n 8. As noted below, we defer to the trial judge's determination that the testimony offered was contradictory and would not have altered the outcome.

[21] The prosecutor argued that Mr. Mason shot Mr. Harlin at defendant's direction according to Mr. Thompson's testimony. Counsel argued that the prosecutor's witnesses were not credible, that Thompson's testimony was equivocal, and that the burden of proof had not been sustained because the evidence amounted to nothing more than a "ball of confusion." Counsel effectively cross-examined the witnesses consistent with his theory of the case. The jury convicted defendant of second-degree murder after Mr. Evelyn successfully moved for a directed verdict that the evidence was insufficient on the elements of first-degree murder.

[22] Counsel also succeeded in excluding damaging evidence from apartment 302.

teed the defendant by the Sixth Amendment." *Id.* The second requires that "counsel's ineffective assistance must be found to have been prejudicial in order to reverse an otherwise valid conviction." *Pickens* at 314.

Defendant's claims of ineffective assistance fail on both scores. Nothing in the record indicates that counsel erred in not calling witnesses who were not present when the victim was shot and whose testimony, at best, would have affected only matters collateral to the prosecutor's theory that the defendant, as leader of a drug ring, gave the order to kill Mr. Harlin.[23]

Any claim that the probability is high that had Nelson and Woodson been called defendant would have been acquitted underscores the record deficiencies the dissent ignores. Whether the witnesses were known to counsel or, if known, would have been deemed by him to be believable by the jury is unknown. It is far from evident, however, that the tes-

---

[23] There was unrebutted testimony that defendant ordered the shooting. Testimony that Thompson came in with the gun could not rebut this testimony. The third witness, Mr. Mason, was a codefendant and the alleged shooter, and was therefore unavailable to testify in defendant's case until he took the stand in his own case before a separate jury, where he testified the gun belonged to Mr. Thompson. Theoretically, had Mr. Mason's testimony been beneficial to defendant Mitchell's case, Mr. Evelyn could have moved to reopen the case. There are several reasons why this argument does not support the claim that the failure to move to reopen could be found objectively unreasonable on this record. First, given that the two defendants had separate juries and severance is only mandated where it is "necessary to avoid prejudice to substantial rights of the defendant," MCR 6.121(C); *People v Hana*, 447 Mich 325; 524 NW2d 682 (1994), counsel would presume Mason's testimony would be harmful to Mitchell. Second, we cannot evaluate Mason's trial testimony because the record before us does not include Mr. Mason's trial testimony before the *Mason* jury. Third, because Mr. Evelyn was not called at the *Ginther* hearing, we have no way of knowing how he evaluated the situation.

timony of two persons who allegedly happened to be merely present playing chess in a dope house at 10:00 P.M. would be credited by the factfinder. For precisely this reason, Mr. Evelyn's testimony was critical to a proper assessment of the claim. As the Court observed in *Strickland*:

> [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. [*Id.* at 691.]

Counsel may have failed to call the witnesses because he did not know about them. Alternatively, he may not have called them because of a familiar strategic consideration, namely, that calling witnesses whose testimony is not believable (even with regard to peripheral matters), may jeopardize an otherwise viable defense. On this record, there is no basis to conclude that the failure to present these witnesses was error or that, had the witnesses been presented, "the factfinder would have had a reasonable doubt respecting guilt." *Strickland, supra* at 695.

The dissent's conclusion that Mr. Evelyn's performance at trial is irrelevant, *post* at 199,[24] ignores teaching of the United States Supreme Court that "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his law-

---

[24] Of course, calling this a "total denial of counsel" is misleading where counsel was not absent during the entire seven-month pretrial phase, but only for thirty days of that phase.

yer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance." *Cronic* at 657, n 21.[25] Unless the defendant shows a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, a Sixth Amendment violation has not been established.

The dissent would improvidently extend a remedy to a defendant who received constitutionally effective assistance and who has not been wronged in any real sense.[26] As the Court observed in *Strickland*, when rejecting a presumption of ineffectiveness regarding

---

[25] Like all attorneys eligible to receive appointments in Detroit Recorder's and Wayne Circuit Courts, Mr. Evelyn had completed the requirements of the criminal advocacy program designed to assure more than minimal competence for attorneys representing indigent attorneys. Indeed, in September 1996, Mr. Evelyn was selected to teach one of the eight seminars offered in the 1996 Detroit/Wayne County Criminal Advocacy Program. That program has been in existence since 1983 "for the purpose of developing, expanding, and maintaining high professional standards of representation in felony cases." *Detroit/Wayne County 1996 Criminal Advocacy Program Announcement.* It was "designed and developed under the joint auspices of judges, members of the private bar, police, prosecutors, and defense attorneys." *Id.* In order to continue receiving appointments in Recorder's Court, attorneys with less than ten years experience must attend six of the ten seminars offered each year, and attorneys with over ten years experience must attend at least two.

[26] The dissent would adopt its categorical approach to ineffective assistance for failure to investigate or prepare because of lack of time despite *Cronic*'s warning "against using any rule of thumb . . . in determining how much time was needed for defense preparation." LaFave & Israel, *supra*, § 11.8 at 28. It is unclear whether this would create a presumption that the prosecutor would be obligated to rebut or a rule of reversal per se. The Supreme Court has adopted a rebuttable presumption of prejudice in some cases, thereby shifting the burden of showing absence of prejudice to the prosecution. See, e.g., *Cuyler v Sullivan*, 446 US 335; 100 S Ct 1708; 64 L Ed 2d 333 (1980). Even under this approach, the defendant's claim here would fail because the record establishes that he suffered no prejudice from the suspension or failure to call witnesses.

alleged individual deficiencies in performance by counsel representing defendants in a criminal trial:

> Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client. [*Id.* at 690.]

Justice RILEY's observation in *Pickens* is also apt:

> [T]he inevitable result of such a formulation would be an explosion of civil litigation in which juries would be permitted to award damages to a defendant who by definition has been reliably found guilty . . . [t]hat such a perversion of the truth-seeking function of criminal trials was not intended by the Michigan Constitution is beyond question. [*Id.* at 325-326, n 31.]

### V. THE LIMITS OF APPELLATE REVIEW

A reality underlying the *Cronic-Strickland* continuum is the inability of an appellate court to evaluate in hindsight the infinite variables of trial court practice and the "countless ways to provide effective assistance in any given case." *Id.* at 689. For the same reason, the attorney-client privilege is waived and the trial lawyer is a necessary witness on the issue of inadequacy of counsel:

> At the hearing, the witness, Williams and Williams' lawyer are all necessary witnesses. The lawyer is necessary because even the truth and further elaboration of the witness' assertions would not necessarily require a finding of

inadequacy of counsel. By putting in issue the effectiveness of the representation he received at the trial, Williams waived the attorney-client privilege. [*People v Michael Williams*, 391 Mich 832, 832 (1974).][27]

Absent any presentation of counsel's testimony to the trial court, or an inquiry into whether defendant was prejudiced by the suspension, reversal of the trial court's conclusion that the defendant failed to carry his burden at the *Ginther* hearing would be postulated not on truth but on pure conjecture. The dissent's approach, despite the holdings in *Williams*, *Ginther*, *Cronic*, *Strickland*, *Pickens*, and *People v Pubrat*, 451 Mich 589; 548 NW2d 595 (1996), would permit defense lawyers to be "found guilty" of ineffective assistance without ever being heard from and face the unenviable prospect of looking to the prosecutor to protect them at the *Ginther* hearing.[28]

We do not know that Mr. Evelyn did not "exert at least some effort to explore the truth . . . ." *Post* at 191, n 7. We do not even know that Mr. Evelyn failed to prepare with regard to the *Ginther* hearing witnesses. We do know that Mr. Evelyn prepared by holding the preliminary examination and obtaining discovery and that he obtained a directed verdict of

[27] "It is well established that a defendant in a criminal case who asserts ineffective assistance of counsel waives by doing so the attorney-client privilege." *Howe v Detroit Free Press*, 440 Mich 203, 236; 487 NW2d 374 (1992) (separate opinion of LEVIN, J.). See also *Tasby v United States*, 504 F2d 332, 336 (CA 8, 1974).

[28] Again, however, the dissent could be interpreted to advocate allowing an appellate court to simply presume ineffective assistance upon the allegation of inability or failure to prepare so that evidence of prejudice from either party would be wholly irrelevant. We reject this result because, by obviating the *Ginther* procedure in many cases, it would violate *Strickland*'s admonition to assess whether "a particular decision not to investigate [is reasonable], applying a heavy measure of deference to counsel's judgments." *Id.* at 691.

not guilty of first-degree murder. Mr. Evelyn should not be deemed guilty of malpractice without his having been given the opportunity to be heard, nor should the defendant be afforded a new trial without record basis for a finding that his conviction was unfairly obtained.[29]

In the real world, defending criminal cases is not for the faint of heart. Lawyers must fulfill ethical obligations to the court, zealously advocate the client's best interests (which includes establishing that they, and not the client, are in charge of making the professional decisions), and protect themselves against grievances[30] and claims of malpractice. Lawyers will inevitably make errors in the process, but, because both cases and attorneys come in an infinite variety of configurations, those errors can only rarely be

---

[29] The dissent attempts to avoid our holding in *People v Pubrat, supra,* that the test for claims of ineffective assistance stemming from disciplinary suspension is that which is set forth in *Strickland* by suggesting that there is a difference between a suspended lawyer who continues to represent a defendant and a lawyer who it is assumed did not prepare during the period of suspension. Aside from the fact that this approach discourages disciplined lawyers from abiding by their obligation not to practice during a period of suspension, the dissent offers no explanation for why prejudice should be presumed during one temporary suspension, but not the other. Moreover, given the fact that a suspended or disbarred attorney is not prohibited from working in the capacity of an "agent, clerk or employee" of a licensed attorney, *Grievance Administrator v Chappell,* 418 Mich 1202 (1984), there is neither reason nor justice to create an inference that defendant Mitchell received "no counsel at all during this period." *Post* at 191, n 6.

[30] The dissent appears to attach weight to defendant's expressions of discontent, and to his having filed a grievance against Mr. Evelyn and requested new counsel and an adjournment of trial. *Post* at 197-198. While the trial court would have been well advised to have made an earlier and more complete record, regarding defendant's complaint, the weight afforded to these complaints betrays naiveté. Grievances against attorneys and judges may be legitimate. They are also prompted by a desire for a new judge, a new attorney, or an adjournment, and are routine incidents in Recorder's Court.

defined "with sufficient precision to inform defense attorneys correctly just what conduct to avoid." *Strickland* at 693. Thus, the Sixth Amendment guarantees a range of reasonably competent advice and a reliable result. It does not guarantee infallible counsel.

An inference of constitutional ineffectiveness cannot be established on the basis of the "circumstance" of counsel's thirty-day suspension during seven months of representation, without any inquiry into the conduct of the trial or any record being developed regarding counsel's actual preparedness and its effect on the result.

### VI. APPELLATE COUNSEL

Defendant also claims appellate counsel was ineffective in failing to call trial counsel at the *Ginther* hearing. There is no better evidence for why this claim should be rejected than the dissent's holding that ineffectiveness may be inferred without the inquiry into performance and prejudice, which presumes that counsel's conduct fell within the wide range of reasonable professional assistance.

Appellate counsel had an obvious strategic reason for not calling trial counsel. That reason was that if trial counsel had been called, his explanation for his actions might have been more believable than the testimony of the witnesses offered at the *Ginther* hearing. Appellate counsel may have failed to call trial counsel at the *Ginther* hearing because he determined trial counsel would have testified that he did not have notice of the witnesses or that he had a strategic reason for not presenting them (such as credibility or relevance). In any event, because these are

strategic decisions, there is no basis to conclude appellate counsel was constitutionally ineffective.

## VII. PROSECUTOR'S RIGHT TO APPEAL

### A. SENTENCING REVIEW

In *People v Coles*, 417 Mich 523; 339 NW2d 540 (1983), this Court, by unanimous vote of all justices participating,[31] recognized a defendant's right to appellate review of a sentence. The Court held:

> [A] sentence following a conviction is as much a part of the final judgment of the trial court as is the conviction itself. Since the Court of Appeals has jurisdiction to hear appeals of final judgments of trial courts, . . . the Court of Appeals has jurisdiction to hear appeals involving a review of a defendant's sentence. [*Id.* at 535.]

In 1988, the Legislature amended MCL 770.12; MSA 28.1109 to expressly provide for prosecutorial appeals of right and by leave "if the protection against double jeopardy [under the state and federal constitutions] would not bar further proceedings against the defendant . . . ." Reviewing the statute last term, we held that it was enacted "to give the people the same essential right to appeal and seek leave as a defendant enjoys, within the limits of the constitutional prohibition against double jeopardy." *People v Torres*, 452 Mich 43, 55; 549 NW2d 540 (1996). It follows that both the prosecutor and the defendant may appeal the sentence under *Coles, supra*; MCL 770.12; MSA 28.1109.[32]

---

[31] Justice BOYLE did not participate.

[32] An appeal by a defendant "who pleads guilty or nolo contendere shall be by leave of the court . . . ." Const 1963, art 1, § 20, ratified November 8, 1994, effective December 24, 1994.

## B. REVIEW OF GUIDELINES CALCULATIONS

Defendant argues, essentially, that a defendant's right to appeal a sentence on the basis of an erroneous guidelines score is grounded in the due process right to be sentenced on the basis of accurate information. *Townsend v Burke*, 334 US 736; 68 S Ct 1252; 92 L Ed 1690 (1948). Because due process protects only individuals against state authority, defendant contends that the state cannot assert a right to a rule of symmetry with regard to sentencing appeals.

The holding in *Townsend* is inapposite. First, in *Townsend*, the United States Supreme Court held that there is no basis for the assertion of a due process right to be sentenced on correct information unless the sentence is based on an "extensively and materially false" foundation. *Townsend, supra* at 741. The misapplication of the guidelines typically advanced is not premised on a false foundation. The claim advanced is that the guidelines were misapplied because the instructions were not properly interpreted or because an undisputed foundation is "insufficient" to support the score. These claims do not rest on allegations of falsity or lack of factual foundation. They would be claims of legal error if guidelines had the force of law.[33]

---

[33] In the federal system, for example, although the decision of a federal judge not to depart from the guidelines is an unreviewable exercise of the trial court's discretion, miscalculation of the guidelines range is subject to appellate review as *legal* error. 18 USC 3742(f)(1) (authorizing remand with instructions where a trial court applies guidelines incorrectly); *United States v Grandmaison*, 77 F3d 555, 560 (CA 1, 1996); *United States v Gifford*, 17 F3d 462, 473 (CA 1, 1994); *United States v Hilton*, 946 F2d 955, 957 (CA 1, 1991). Departures from the federal guidelines are reviewed only for abuse of discretion. *Koon v United States*, 518 US 81; 116 S Ct 2035; 135 L Ed 2d 392 (1996).

More fundamentally, reference to the constitutional guarantee of procedural due process at sentencing does not address the principal question presented, which is whether either a defendant or a prosecutor has a substantive right to challenge a guideline miscalculation or misinterpretation, which does not have the force of law. Unlike the federal system, in which the sentencing guidelines are substantive law promulgated pursuant to an act of Congress, 28 USC 994(a) (authorizing promulgation of federal sentencing guidelines by United States Sentencing Commission), or those sister states in which guidelines have been adopted by the legislature, current guidelines used by the trial courts in Michigan exist solely as a result of Administrative Order No. 1988-4.[34] As explained in

---

[34] Careful evaluation of the effect on trial and appellate courts will undoubtedly attend legislative adoption of sentencing guidelines pursuant to 1994 PA 445; MCL 769.32 *et seq.*; MSA 28.1097(3.2) *et seq.* The Court of Appeals experienced a 132 percent increase in appeals in criminal cases between 1988 and 1994. This Court has not published a single opinion remanding a sentence for failure to meet the requirements of proportionality since *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), and my research indicates that only two such cases have been remanded or reversed by order. This research also indicates that the Court of Appeals has published approximately fifteen such reversals during the same period, with only six since *People v Merriweather*, 447 Mich 799; 527 NW2d 460 (1994). On the other hand, a conservative estimate based on very rough research indicates that during the six years since *Milbourn* was decided this Court has reviewed well over one thousand cases in which this issue was raised. Given the administrative burden of the appeals generated and the limited nature of relief available, the benefit from such allocation of resources is, at best, unclear. The federal guidelines have been widely criticized for the rigidity with which they constrain trial court discretion and for the burden imposed on appellate courts. See, e.g., Freed, *Federal sentencing in the wake of guidelines: Unacceptable limits on the discretion of sentencers*, 101 Yale L J 1681 (1992); Schulhofer, *Assessing the federal sentencing process: The problem is uniformity, not disparity*, 29 Am Crim L R 833 (1992); Weinstein, *A trial judge's reflections on departures from the federal sentencing guidelines*, 5 Fed Sent Rep 6 (1992); Alschuler, *The failure of the sentencing guidelines: A plea for less aggregation*, 58 U Chi L R 901 (1991). This criticism

*People v Milbourn*, 435 Mich 630, 656-657; 461 NW2d 1 (1990):

> [W]e believe that the second edition of the sentencing guidelines is the best "barometer" of where on the continuum from the least to the most threatening circumstances a given case falls.
>
> Nevertheless, because our sentencing guidelines do not have a legislative mandate, we are not prepared to *require* adherence to the guidelines. [Emphasis in the original.]

Simply stated, because this Court's guidelines do not have the force of law, a guidelines error does not violate the law.[35] Thus, the claim of a miscalculated variable is not in itself a claim of legal error.[36]

---

may have been part of the impetus for the decisions in *Williams v United States*, 503 US 193; 112 S Ct 1112; 117 L Ed 2d 341 (1992), and *Koon*, n 33 *supra*, which clearly return some of the trial court's ability to individualize sentences and reject the concept of automatic reversal for guideline error.

[35] For the same reason, error cannot be predicated on a claim that the instructions were misinterpreted.

[36] Errors in calculation of sentencing variables and even reliance upon some invalid factors in arriving at a sentence that departs from the guidelines do not necessarily invalidate a sentence under federal law. The *Williams* Court explicitly held that an appellate court need not invalidate a sentence on the basis of an improper factor where the prosecution can establish that the sentence would have been the same absent the improper consideration. *Williams*, n 34 *supra* at 203; accord *People v Hernandez*, 443 Mich 1, 12, n 13; 503 NW2d 629 (1993). It appears that, under federal law, a sentence will be insulated from reversal on appeal if the judge states on the record that the sentence would have been the same had the judge only considered proper factors. *Id.*; Parham, *Grist for the mill of sentencing guideline reform:* Williams v United States, 28 Wake Forest L R 487 (1993). Even though the *Koon* Court held that federal judges may not base departures on factors expressly forbidden in the federal guidelines, *Williams* provides that a sentence will not be overturned where the error is harmless. *Williams*, n 34 *supra* at 203 (citing F R Crim P 52[a]). The Court reasoned that a sentence can still "be 'reasonable' even if some of the reasons given by the district court to justify the departure from the presumptive guideline range are invalid, provided that the remaining reasons are sufficient to justify the magnitude of the departure." *Id.* at 204.

We have long recognized and recently reaffirmed that a sentence may be set aside only when it is invalid. *People v Whalen*, 412 Mich 166, 169-170; 312 NW2d 638 (1981); *In re Jenkins*, 438 Mich 364, 373; 475 NW2d 297 (1991). In *Jenkins*, we observed in dicta that the defendant may challenge the scoring of the sentencing guidelines under MCR 6.429; and in *People v Hernandez*, 443 Mich 1; 503 NW2d 629 (1993), and *People v Walker*, 428 Mich 261; 407 NW2d 367 (1987), we discussed preservation of guidelines scoring issues. To the extent that our decisions have been construed to authorize review and reversal for scoring errors or errors of misinterpretation, *Milbourn*'s correct observation that guidelines do not have the force of law is controlling. Such relief is unavailable.[37]

The challenge here asserted is directed not to the accuracy of the factual basis for the sentence, but, rather, to the judge's calculation of the sentencing variable on the basis of his discretionary interpretation of the unchallenged facts. The challenge does not state a cognizable claim for relief. There is no juridi-

---

[37] As in *Walker*, an "effective challenge" involving guidelines is a challenge to the accuracy of the factual information on which the sentence was based, a challenge grounded in the due process clause under *Townsend*. *Walker* authorized a review procedure for the preservation of sentencing appeals. *Hernandez* limited *Walker* by holding that an appellate court is not compelled to grant a motion to remand where there was "evidence supporting the judge's initial scoring of the sentencing guidelines variable . . . ." *Id.* at 3. As in *Walker*, the challenge in *Hernandez* centered on the factual accuracy of the basis for the sentence. Properly understood, *Hernandez* affirmed that the accuracy of the information and the adequate notice in the presentence report gave rise to reviewable claims on appeal. It did not authorize a challenge on the basis of the judge's interpretation of the facts underlying the sentence and the scoring decisions based on it, that is, the manner in which the judge scored the variables.

cal basis for claims of error based on alleged misinterpretation of the guidelines, instructions regarding how the guidelines should be applied, or misapplication of guideline variables.[38]

As emphasized in *Milbourn*, the guidelines are vehicles to assist the trial judge regarding where a given defendant falls on the sentence continuum recognized by *Milbourn*. Where the guidelines calculation differs from the trial court's intended sentence, the judge is alerted that the sentence falls outside a normative range and should be evaluated to assure that it is not unfairly disparate, has a rational basis, and is not disproportionate.[39] On postsentence review, guidelines departure is relevant solely for its bearing on the *Milbourn* claim that the sentence is disproportionate.[40] Thus, application of the guidelines states a cognizable claim on appeal only where (1) a factual predicate is wholly unsupported, (2) a factual predicate is materially false, and (3) the sentence is disproportionate.[41]

---

[38] My brother CAVANAGH's separate statement prompts a response. The fact that some persons cannot see the point of the constitutional limits of judicial authority is precisely the point of repetitively pointing it out.

[39] Where an error was based on an "extensively and materially false" foundation, *Townsend* requires review. We have not decided the issue whether such a challenge may be asserted by a prosecutor on behalf of a crime victim under Const 1963, art 1, § 24.

[40] Contrary to defendant's claim, we have never held that the sentencing guidelines provide a clear basis on which sentences might be overturned on appeal. Moreover, in requiring judges to state their reasons for departing from the guidelines, the order *does not* speak of appellate review, but, rather, of the Sentencing Guidelines Advisory Commission's use of that information in generating analysis of whether the guidelines are working effectively.

[41] To ask whether it is a misapplication of the guidelines to score points for criminal sexual conduct under OV 12, where prior penetrations were not part "of the same transaction," is to ask a question whose answer has no legal relevance on appeal. As an inquiry about what the guidelines committee had in mind regarding assessment measures that do not have

Appellate courts are not to interpret the guidelines or to score and rescore the variables for offenses and prior record to determine if they were correctly applied. Guidelines are tools to aid the trial court in the exercise of its authority and a framework for the appellate courts' inquiry into the question whether the sentence is disproportionate and, hence, an abuse of the trial court's discretion. The Court of Appeals erred in reversing defendant's sentence.

### VIII. CONCLUSION

For the reasons stated above, we affirm the decision of the Court of Appeals that defendant was not deprived of the effective assistance of counsel and vacate its order remanding this case to the trial court for resentencing.

BRICKLEY and RILEY, JJ., concurred with BOYLE, J.

MALLETT, C.J. I respectfully dissent from parts II through V of the majority opinion. Counsel's disciplinary suspension precluded him from preparing defendant Mitchell's defense during the critical period leading to his first-degree murder trial. Mr. Mitchell's repeated attempts to obtain substitute counsel went unheeded and his trial began, as scheduled, on the morning that his attorney's suspension expired. Consequently, defendant was denied the assistance of counsel during the critical period leading to trial.

I would hold that the specific facts of this case justify a presumption of ineffectiveness without inquiry into actual performance or prejudice. *United States v*

the force of law, the inquiry, at best, asks for an opinion about how the majority of judges would have sentenced the defendant.

*Cronic*, 466 US 648, 653; 104 S Ct 2039; 80 L Ed 2d
657 (1984), *Powell v Alabama*, 287 US 45; 53 S Ct 55;
77 L Ed 158 (1932). I would therefore reverse the
Court of Appeals decision and remand for a new trial.

I

BACKGROUND

The prosecution's theory was that the defendant
was the leader of a drug-trafficking ring and that he
had been effectively in charge of all that took place in
his apartment on the night of Raymond Harlin's death.
Defendant was depicted by the prosecution witnesses
as a midlevel drug dealer. His apartment allegedly
served as a wholesale warehouse for several street-
level sellers who conducted illicit drug sales in the
first floor lobby of the apartment building. Harlin had
allegedly been working for the defendant.

The pertinent events surrounding Mr. Harlin's death
occurred in the defendant's apartment about 10:00 P.M.
Those initially present were defendant Mitchell, Mr.
Harlin, codefendant Antonio Moore, and two friends
of the defendant, Serena Nelson and Brent Woodson.
There was no evidence that either Nelson or Wood-
son were involved in the alleged drug ring.

The only evidence at trial concerning the start of
the altercation was the statement Mr. Mitchell gave to
the police indicating that the fight had started in the
kitchen after Moore had become angry at the way the
victim was staring at him. At the *Ginther*[1] hearing,
Woodson and Nelson also testified that the fight had
broken out between Moore and Harlin in the kitchen
over somebody looking at somebody strangely or

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

making someone feel uncomfortable. Woodson testified that he never saw Mr. Mitchell participating in the fight, nor did he hear him encouraging anyone to shoot anyone else. Nelson and Woodson left the apartment some time after the altercation began and shortly after Tyrone Thompson and Richard Puryear arrived.

Both Thompson and Puryear testified at the trial. They were involved in drug sales from the apartment lobby, although, apparently, the defendant was not their supplier. Thompson, the prosecution's primary witness, testified that Harlin was already bloodied when he arrived at the apartment. He stated that a gun was in plain view on a window ledge and that he took possession of the gun out of fear that the defendant would shoot Harlin. At the *Ginther* hearing, Nelson and Woodson disputed this testimony, both indicating that they never saw a gun in plain view on the window sill and that Thompson had the weapon in his possession when he entered the apartment.

Thompson testified that he heard the defendant exclaim, "Shoot a hole in his heart."[2] Soon after this occurred, codefendant Lamont Mason, who ultimately fired the shots, and Nehemiah Anderson arrived. Apparently, Mason was involved in the defendant's drug business and Anderson had come to the building to purchase drugs. Thompson testified that by the time Mason arrived, he thought that the situation was calming down. Consequently, he laid down the gun that he had been holding. To his surprise, after laying

---

[2] The statement may have been, "[S]hoot the [whore] in the heart," or, as defendant's attorney contended, "I should shoot this [whore] in the heart."

down the gun, Mason picked it up and shot Harlin in the neck and back.

Harlin jumped out the third floor window. Amazingly, he was able to summon a cab, taking it to Henry Ford Hospital where he later died of gunshot wounds of the neck and back.

Defendants Mitchell, Mason, and Moore were all charged with first-degree murder. Mason and Moore moved for separate trials. The court ruled that separate juries would hear defendant Mitchell's and codefendant Mason's cases, while codefendant Moore opted for a bench trial.

The defendant did not testify or present any witnesses. At the close of proofs, his attorney moved for a directed verdict. The court partially granted the motion by reducing the charge to second-degree murder. MCL 750.317; MSA 28.549. The jury convicted defendant of that charge. Lamont Mason, who everyone seems to agree fired the shots, was acquitted by his separate jury. The court found Antonio Moore, who according to the defendant and codefendant Mason, was the primary aggressor in Harlin's beating, guilty of felonious assault and placed him on probation.

Defendant wrote numerous letters complaining about Mr. Evelyn's representation. For example, in a letter to Judge Farmer he complained that "I have been locked up for 5 months and not once have my lawyer took time out to talk to me. . . . [I]f I can't express to Gerald K. Evelyn what happen on the night this incentdent occur [sic], he will not know the best stradaegy [sic] of what and how to fight this case. . . . I am tired of being in the dark & knowing he's in the dark." He also complained of not having

his transcripts, of repeated efforts to contact counsel, and of counsel's failure to file necessary pretrial motions.

A hearing was held on defendant's complaints eleven days before the scheduled trial date. At the hearing, defendant requested a change in counsel and an adjournment to allow time for new counsel to prepare. He also informed the court of Mr. Evelyn's disciplinary suspension. The court never ruled on Mr. Mitchell's request, instead taking the motion under advisement in order to allow Mr. Evelyn to respond. Mr. Evelyn had been notified of the hearing, but neither he nor his law partner appeared.

Mr. Mitchell renewed his complaint on the second day of jury selection, after counsel failed to visit him as promised the previous evening. Defendant explained his concerns to the court:

> Well, from the very beginning, you know, Mr. Evelyn promised to talk with me. He has failed to talk with me on every occasion that he promised. He has failed to make any motions for me, and he's failed to talk with my mother, which she has written many letters and calls, and went to his office, also, left word with his secretary.
>
> And he also showed up an hour late on my final conference and by him letting me know yesterday that he was going to come over and talk with me and by him failing to do that, I just, I just feel it's just incompetent.

After the court asked if defendant's complaint was that counsel had not visited him at the jail as many times as he would have liked, Mr. Mitchell responded, "Yes. Never seeing me at all." Counsel responded by explaining that he had supplied defendant with all the records that he had requested. Although Mr. Mitchell agreed, he stated that reading the records without his

counsel's assistance left him feeling that he was being "misrepresented." He further stated that "[t]he only time I meet him is in the courtroom, or brief discussion in the bullpen with plenty of other people in the bullpen. I just don't see how courts can say that that's true fairness." Mr. Mitchell, who wore a hearing aid, also complained that when counsel met with him in the courtroom or in the bull pen, he had difficulty hearing most of what counsel said. After hearing these complaints and holding a lengthy discussion about motions that defendant felt should be made on his behalf and directing counsel to meet with defendant that afternoon, the court denied the motion for substitute counsel.

On the sixth day of trial, Mr. Evelyn acknowledged his receipt of a grievance filed by defendant with the Attorney Grievance Commission and formally requested to withdraw. For reasons discussed more fully in part IV, the request was denied.

After his conviction, the defendant and the prosecutor appealed. The Court of Appeals consolidated the appeals and remanded for a *Ginther* hearing. After the hearing, the Court rejected defendant's Sixth Amendment claims, holding that Mr. Mitchell had not met the standard for ineffective assistance and had abandoned any claim of error by failing to continue his objection to counsel's performance midtrial.

After providing a brief overview of the right to the effective assistance of counsel in part II, part III will address how the circumstances in this case led to a denial per se of Mr. Mitchell's Sixth Amendment rights. Finally, part IV will explain that Mr. Mitchell's expression of satisfaction with counsel's midtrial per-

formance cannot act to waive or abandon his ineffective assistance claim.

## II
### THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence. [US Const, Am VI.]

Similarly, the Michigan Constitution states that, "[i]n every criminal prosecution, the accused shall have . . . assistance of counsel for his defense . . . ." Const 1963, art 1, § 20.

The constitutional guarantee of the assistance of counsel is a fundamental component of our criminal justice system. The assistance of a competent attorney is essential because it provides the means through which the other rights of the accused are secured. Consequently, without counsel's assistance, the right to a trial would mean little. *Cronic, supra* at 653. Notable federal and Michigan jurists have long recognized the importance of the right to the assistance of counsel. Justice Sutherland, in his opinion in *Powell, supra* at 68-69, emphasized:

> *The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.* Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of

counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. *He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him.* [Emphasis added.]

Justice COOLEY similarly noted the importance of the right, stating that " '[p]erhaps the privilege most important to the person accused of crime, connected with his trial, is that to be defended by counsel.' " *People v Pickens*, 446 Mich 298, 311; 521 NW2d 797 (1994), quoting 1 Cooley, Constitutional Limitations (8th ed), p 696.

Because of its great importance in our adversary system, the right to the assistance of counsel includes the right to the effective assistance of counsel. *Cronic* at 654, citing *McMann v Richardson*, 397 US 759, 771, n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970).

In *People v Pickens, supra,* a majority of this Court held that the Michigan constitutional guarantee of the right to the effective assistance of counsel is coextensive with its federal counterpart. Consequently, this Court applied the two-part test announced by the United States Supreme Court in *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The *Strickland* test requires examining whether counsel's errors fell below an objective standard of reasonableness and whether the errors so prejudiced the defendant so as to deprive him of a fair trial.

The *Strickland* performance/prejudice analysis is not the sole indicia of ineffective assistance. The United States Supreme Court in *Cronic, supra,* the

companion case to *Strickland,* stated that the Sixth Amendment guarantee *generally* is not implicated unless there is some effect of counsel's substandard performance on the reliability of the trial process. The Court in *Cronic* further explained that there are circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. These circumstances include a complete denial of counsel at a critical stage of the proceedings, as occurred here, and a complete failure to subject the prosecution's case to meaningful adversarial testing. Another such circumstance, particularly applicable here, is "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-660. Finally, a presumption of prejudice attaches when the state or the court prevents counsel from rendering assistance by directly interfering with the attorney-client relationship. *Geders v United States,* 425 US 80; 96 S Ct 1330; 47 L Ed 2d 592 (1976).

I would find that under the per se approach discussed in *Cronic* and *Geders,* defendant was denied the effective assistance of counsel.

III

PER SE STANDARD

When the surrounding circumstances make it so unlikely that any lawyer could provide effective assistance, ineffectiveness may be presumed without inquiry into actual performance or prejudice. *Cronic*

at 661. As explained by the Court in *Cronic*, *Powell v Alabama* exemplifies this type of ineffectiveness.

In *Powell*, the United States Supreme Court relied on the Due Process Clause to find a denial of fundamental fairness to the "Scottsboro Boys," nine illiterate young black men accused of capital rape in Alabama in 1931. Six days before trial, the judge appointed "all the members of the bar" to represent the defendants for purposes of arraignment. *Id.* at 49. On the day of trial, a lawyer from Tennessee appeared after speaking to persons "interested" in the case. However, he stated that because he was unprepared and unfamiliar with local procedure, he was unwilling to represent the defendants on such short notice. The trial court resolved the problem by deciding that the Tennessee lawyer would represent the defendants with assistance from the local bar and ordered that the trial begin as scheduled.

The United States Supreme Court held that "such designation of counsel as was attempted was either so indefinite *or so close upon the trial as to amount to a denial of effective and substantial aid . . . ." Id.* at 53. Without examining the actual performance of counsel at trial, the Court concluded that under the circumstances, the trial was inherently unfair because the likelihood that counsel could have performed as an effective adversary was too remote. Critical to the Court's analysis was counsel's inability to prepare or to conduct pretrial investigation because of his appointment on the day of trial.

> It is not enough to assume that counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt

and thorough-going investigation might disclose as to the facts. No attempt was made to investigate. No opportunity to do so was given. Defendants were immediately hurried to trial. . . . Under the circumstances disclosed, we hold that defendants were not accorded the right of counsel in any substantial sense. To decide otherwise, would simply be to ignore actualities. [*Id.* at 58.]

These words apply forcefully to Mr. Evelyn's representation of the defendant. As in *Powell*, the circumstances surrounding defendant's representation precluded crucial trial preparation. As in *Powell*, defendant was hurried to trial on the same day that counsel was able to first provide any meaningful pretrial assistance. As in *Powell*, this Court cannot assume some feigned tactical reason for counsel's failure to contact defendant while he was in prison or to otherwise investigate and interview witnesses during the critical thirty-four days before trial. Mr. Evelyn could not prepare for Mr. Mitchell's defense, as a matter of law, because he was prevented from doing so by his disciplinary suspension.[3]

Other cases also illustrate circumstances justifying a presumption of ineffectiveness. A long line of federal and state precedent holds that Sixth Amendment

---

[3] Since *Powell*, other courts have held that a lack of preparation can constitute ineffectiveness per se. In *State v Johnson*, 24 Ohio St 3d 87; 494 NE2d 1061 (1986), the Supreme Court of Ohio held that failure to prepare for sentencing proceedings in a capital case was a violation per se of the defendant's Sixth Amendment rights. The court noted counsel's failure to investigate mitigating factors and his failure to discuss the penalty aspect of the case with his client before the sentencing hearing.

Similarly, in *State v Anderson*, 117 NJ Super 507; 285 A2d 234 (1971), modified on other grounds 60 NJ 437; 290 A2d 447 (1972), the Superior Court of New Jersey held that forcing a defendant to trial on the day that he first conversed with his defense attorney, and when counsel had done no other preparation, constituted ineffective assistance, without a specific finding of prejudice.

rights are violated when the defendant is denied counsel at a critical stage in the proceedings. "*Cronic* and *Strickland* make clear that 'where actual or constructive denial of assistance of counsel occurs a per se rule of prejudice applies.'" *Crutchfield v Wainwright*, 803 F2d 1103, 1108 (CA 11, 1986), quoting *Chadwick v Green*, 740 F2d 897, 900, n 3 (CA 11, 1984).[4]

In *Geders, supra*, the Court held that a trial court's order preventing the defendant in a federal criminal prosecution from consulting his counsel "about anything" during a seventeen-hour recess in the trial between his direct and cross-examination deprived him of his right to the assistance of counsel. The Court emphasized that overnight recesses are often critical periods for preparation:

---

[4] The majority appears to suggest that only situations involving factors other than lack of preparation and investigation can justify application of a per se rule. *Cronic*'s numerous and lengthy references to *Powell* irrefutably dispute this and make clear that the question whether lack of preparation and investigation justify a per se rule is one of degree. In this regard, *Cronic* and *Strickland* are factually distinguishable from the present case.

*Cronic* involved a young, fairly inexperienced attorney appointed to represent a defendant against mail fraud charges twenty-five days before trial. After careful analysis regarding the adequacy of the allowed preparation time, the court concluded that twenty-five days was "not so short that it even arguably justifies a presumption that no lawyer could provide the respondent with the effective assistance of counsel . . . ." *Id.* at 665. Clearly, the present case is more akin to *Powell* than to *Cronic* in regard to the circumstances surrounding the trial and the available preparation time.

*Strickland* is likewise distinguishable. It involved an attorney who, in preparing for a sentencing hearing, did not seek out character witnesses or request a psychiatric examination. Rather than determining that an insufficient investigation can never constitute ineffectiveness per se, the Court in *Strickland* held that counsel's decision not to present evidence concerning respondent's character and emotional state constituted a reasonable trial strategy under the circumstances presented in that case. As pointed out elsewhere in this opinion, no reasonable trial strategy exists for Mr. Evelyn's failure to investigate.

> Such recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed. The lawyer may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier. [*Geders* at 88.]

This being the case, the Court found that prejudice was so likely to result from the overnight denial of access to counsel that a specific inquiry into prejudice would be superfluous.[5]

Denial of counsel midtrial is but one example of a Sixth Amendment violation per se on the grounds of denial at a critical stage. *Powell, supra* at 57, also emphasizes the importance of counsel during the pretrial stage:

> [P]erhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself.

In this case, the criminal justice and attorney disciplinary systems, without a doubt, combined to deny Mr. Mitchell any assistance of counsel for a full thirty-four days leading to his trial. This denial was especially egregious because counsel had not previously

---

[5] See also *Crutchfield v Wainwright, supra* (holding that the right to counsel was violated by the trial court admonition not to speak with his attorney during a brief trial recess if the record shows that the defendant requested access to his attorney); *State v Bryant,* 545 F2d 1035 (CA 6, 1976) (holding that absent extraordinary circumstances, the right to assistance of counsel was violated where a trial court directs that the defendant not communicate with counsel during a noon recess).

conducted a private in-depth interview with his client to hear his account of the first-degree murder charge and because challenges to the admissibility of evidence had not been addressed and res gestae witnesses had not been contacted.[6]

This is not an instance where counsel chose to take no action. Rather, the circumstances of counsel's disciplinary suspension and the trial court's refusal to assist the defendant in obtaining substitute counsel combined to deprive the defendant of his Sixth Amendment rights by effectuating a total denial of counsel during the critical pretrial period. To hold otherwise would be to say that trial preparation and investigation, in the context of a first-degree murder trial, are not critical.[7] Such a holding would also be

---

[6] The majority relies in part on this Court's decision in *People v Pubrat*, 451 Mich 589, 594-595; 548 NW2d 595 (1996), for its conclusion that Mr. Everett's suspension during the critical pretrial stage does not require reversal. *Pubrat*, however, is distinguishable and has little relevance to the situation presented here. *Pubrat* involved a suspended attorney who continued to actively represent his client during the suspension. Mr. Evelyn did not provide any assistance to Mr. Mitchell during the period of his suspension, which extended through the critical pretrial stage and ended on the morning of trial. While I was troubled, in *Pubrat*, by counsel's unauthorized representation, the situation here is qualitatively different and far more egregious from the defendant's perspective. Rather than receiving questionable counsel from a suspended attorney, defendant Mitchell received no counsel at all during this period.

[7] I also note that Mr. Evelyn's apparent ability to perform relatively well during trial is irrelevant in light of the constructive denial of counsel during the critical pretrial period. Although Evelyn might be a very gifted trial lawyer who knows full well the "rules of the game," this cannot excuse the total lack of preparation. Defending a person in a first-degree murder trial is not a game. Effective representation must mean more than showing up and giving a good performance. If truth seeking is to play some role in our criminal justice system, defense attorneys must exert at least some effort to explore the truth so that, if there is exculpatory evidence available in favor of their client, they can present it.

I further note that Mr. Evelyn's letter to defendant, indicating that he could contact his law partner, Myzell Sowell, for assistance during his suspension, does not excuse or eliminate the constructive denial of counsel.

contrary to the United States Supreme Court's statements in *Powell* emphasizing the importance that adequate preparation plays in giving meaning to the right to counsel:

> "It is vain to give the accused a day in court, with no opportunity to prepare for it, or to guarantee him counsel without giving the latter any opportunity to acquaint himself with the facts or law of the case." [*Id.* at 59, quoting *Commonwealth v O'Keefe*, 298 Pa 169, 173; 148 A 73 (1929).]

The majority's suggestion that a finding that prejudice should be presumed violates "controlling precedent" causes some concern and merits examination. Although unclear, the precedent the majority apparently refers to are cases such as *Cronic* and *Strickland* in which the Court concluded that the claims of inadequate preparation or investigation did not merit a presumption of prejudice. In this regard, the majority states, "[t]he Supreme Court has rejected a categorical prophylactic approach to claims of counsel's deficient performance and of failure to adequately prepare or investigate in favor of an inquiry into actual performance and prejudice." *Ante* at 158. On the other hand, the majority begrudgingly recognizes, in n 10, that in some circumstances, such as those present in *Powell*, prejudice will be presumed.

---

Mr. Mitchell viewed Evelyn as his attorney, not Mr. Sowell. When Evelyn failed to provide defendant with assistance during the pretrial stage, defendant repeatedly asked the court for assistance in obtaining new counsel. He legitimately expected that the court would provide such assistance. Additionally, his mother left numerous messages at the Sowell & Evelyn firm. If Sowell truly had been available, he would have initiated some contact with the defendant.

The fact that the majority reaches a different conclusion than the one I reach does not render either conclusion violative of controlling authority. This is because the disagreement does not concern the basic analytical framework. To the contrary, I agree with my respected sister's premise that the cases concerning ineffective assistance of counsel represent a continuum. My disagreement lies in where this case falls on that continuum.

Contrary to the majority's assertions, I do not contend that the thirty-day suspension alone warrants a finding of ineffective assistance of counsel per se or that a lack of preparation alone warrants a "categorical approach." Rather, I believe that the suspension, combined with the surrounding circumstances and the gravity of the charge justify a presumption of prejudice in this particular case. To reiterate, the record discloses that defendant's attorney was suspended from the practice of law for approximately thirty days before his trial began. The record further reveals that the defendant and his mother attempted to contact Mr. Evelyn on several occasions to arrange a meeting. Defendant also made numerous timely requests to the trial court to appoint him new counsel because he had not been able to tell his attorney his side of the case. In spite of all this, defendant was never able to meet privately with his attorney before trial after his preliminary examination, other than in the "bull pen" before hearings. Given the gravity of the charge, first-degree murder, and the constructive denial of counsel brought on by Mr. Evelyn's suspension and the trial court's refusal to appoint substitute counsel, defendant was denied his right to the effective assistance of counsel per se.

The majority criticizes this analysis by focusing on one element at a time, in isolation, from the totality of circumstances leading to the constructive denial of counsel. Citing *Morris v Slappy*, 461 US 1; 103 S Ct 1610; 75 L Ed 2d 610 (1983), the majority concludes that denial of a 1983 continuance does not warrant a new trial. I agree that not every refusal of a continuance warrants a new trial, only those where there is an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' . . . ." *Id.* at 12-13. The majority also cites *Cronic*, in support of its conclusion that the thirty-day suspension is not an external constraint constituting a constructive denial of counsel and that allegations of deficient performance due to inadequate preparation time do not justify a presumption of prejudice. I agree that a thirty-day suspension alone, out of a seven-month period of representation, would not warrant the presumption. I also agree that not every case where an ill-prepared attorney is forced to trial will warrant the presumption. However, where all the circumstances attendant in this case combine, the whole is qualitatively different from each part taken in isolation. There is no "controlling precedent" in which all the particular circumstances present in this case combine, as they do here, to effectuate a denial of counsel in the critical pretrial period.[8]

---

[8] In its failure to recognize that our disagreement lies in where on the continuum this case falls, the majority argues that "the dissent offers no analysis with respect to how [witnesses Nelson and Woodson] might have made a difference at trial." *Ante* at 163. Given the conclusion that the circumstances justify a presumption of prejudice, there is no need to offer such an analysis. A review of the facts, however, reveals that their testimony, as elicited at the *Ginther* hearing, would have at least undermined Mr. Thompson's testimony, given that their account of the events leading up to the killing did not support Thompson's portrayal of defendant as an

IV

WAIVER/ABANDONMENT OF RIGHT TO COUNSEL

The Court of Appeals concluded that by telling the trial judge six days into the trial that he no longer wanted to pursue the grievance he had filed against his attorney because he was satisfied with counsel's resolution of his concerns, defendant abandoned his ineffective assistance claim. Defendant's Sixth Amendment rights cannot be so easily brushed aside. The issue whether defendant's midtrial withdrawal of his grievance constitutes a waiver or abandonment of his ineffectiveness claim deserves a more searching analysis.

Defendant filed a grievance against Mr. Evelyn with the Attorney Grievance Commission, dated May 1, 1989. On the sixth day of trial, May 15, 1989, Mr. Evelyn moved to withdraw from the case in light of the grievance filed against him. The following colloquy, between Mr. Evelyn, Mr. Mitchell and the court ensued:

> *Mr. Evelyn*: I just want to bring a matter to the Court's attention. As Mr. Mitchell had indicated earlier in his request that I be removed, he did, in fact, file a grievance which I received in my office on Friday, and on Saturday I prepared a response which will go out today, and response includes my reference to the fact that we're in trial and that I think the Canon of Ethics require that I at least make a motion to withdraw from the case at this time, if his position is that he's still dissatisfied.

---

instigator or director of the beating and subsequent killing. Further, their testimony differed from Mr. Thompson's regarding the location and possession of the murder weapon and thus could have been useful to undermine Mr. Thompson's testimony.

I should note for the record that a number of things, the grievance is dated May 1, so a number of things that he was concerned about have been addressed, I should indicate—I suppose that it's possible that his position may have been changed in light of that fact, but I think he should have an opportunity to bring that to the Court's attention and state on the record what his feelings are at this point.

I think that I have to formally request that I be removed from the case at this time.

*The Court*: Mr. Mitchell, anything you have to say?

*Defendant Mitchell*: Yes. I would like to, you know, cancel that grievance, you know, because all the motions and everything that I requested have been answered.

*The Court*: Okay. So your [sic] satisfied with your counsel?

*Defendant Mitchell*: Yes, I'm satisfied, your Honor.

*The Court*: All right, then, the motion to withdraw will be denied and we'll proceed.

*Mr. Evelyn*: Okay.

*Defendant Mitchell*: Thank you, your Honor.

A careful reading of this exchange does not comport with Mr. Mitchell waiving or abandoning his ineffective assistance claim concerning Mr. Evelyn's lack of pretrial investigation and preparation. His statement that he was "satisfied" with counsel cannot be fairly read to mean he no longer believed that it was unjust and prejudicial to force him to begin trial with unprepared counsel. Read in its proper context, this "waiver" is nothing more than Mr. Mitchell's indication that he was "satisfied" with the resolution of the motions he had formerly requested. A close reading of the exchange also suggests that Mr. Mitchell had decided, probably with counsel's advice, to put aside his grievance in order to avoid aggravating the court by disrupting the trial's progress, given that the court's handling of defendant's previous motion for

new counsel made clear that the first priority was to keep the trial on schedule.

Even if Mr. Mitchell's expression of "satisfaction" might be characterized as applying to his counsel's pretrial representation, and not just to counsel's efforts during the trial, the record does not support a knowing and intelligent waiver of counsel during the pretrial stage. Mr. Mitchell's motion for substitute counsel and his grievance regarding lack of pretrial representation clearly put the court on notice that he was not receiving the assistance of counsel during this critical stage. If the court intended to secure a retroactive waiver of defendant's right to pretrial representation, it should have clearly informed defendant, on the record, that this was the intent.[9]

Here, defendant's "waiver" was not knowingly and intelligently made because he was never apprised of the right that he was waiving. Before trial, faced with a total lack of representation on Mr. Evelyn's part, defendant requested new counsel. The trial court did not resolve this request until the day of trial. Just before jury selection, when Mr. Mitchell again raised his right to effective representation, he was told that he could not have new counsel and that the trial

---

[9] In *People v Lane*, 453 Mich 132; 551 NW2d 382 (1996), this Court addressed the requirements of a valid waiver under MCR 6.005(D) at subsequent proceedings where a defendant had previously waived his right to counsel. This Court affirmed that the court should once again engage in the extensive *Anderson* litany, ensuring that the request to proceed without counsel is unequivocally, knowingly, intelligently, and voluntarily made. *People v Anderson*, 398 Mich 361, 367-368; 247 NW2d 857 (1976). While neither the court rule nor the discussion in *Lane* addresses the requirements of a valid retroactive waiver, at least as much caution should be exercised. In fact, it could be argued that even more caution should be exercised in this context because of the possibility of confusion and misunderstanding inherent when rights are waived retroactively.

would have to go forward. When Mr. Mitchell persisted that counsel had not interviewed him or heard his version of the events leading to the death, the court instructed him that he could tell his counsel anything he wished during the recess after the prosecutor's opening argument. He then admonished Mr. Mitchell:

> [I] don't want to mislead you with the impression that just because you're still dissatisfied with your attorney that the Court is going to discontinue the trial and appoint new counsel.

Clearly, rather than acknowledging defendant's right to counsel during the critical pretrial stage, the court made clear that the trial would proceed regardless of defendant's lack of pretrial assistance. The court's handling of Mr. Evelyn's motion to withdraw, relied on by the Court of Appeals, for Mr. Mitchell's "waiver" of his Sixth Amendment rights, woefully failed to set forth on the record a knowing, intelligent, and voluntary waiver of his right to pretrial assistance of counsel. Consequently, his expression of "satisfaction" cannot be construed as a valid waiver.

Further, as noted in *Cronic*, a defendant's expression of satisfaction with counsel's performance at the time of trial, or his later expression of dissatisfaction, is not determinative of an ineffective assistance claim. *Id.* at 657, n 21. The defendant in *Cronic*, as here, expressed his satisfaction with counsel during the course of the trial because this seemed to be the prudent thing to do at the time. See *id.* at 652, n 6. The Court noted, "we attach no weight to either respondent's expression of satisfaction with counsel's performance at the time of his trial, or to his later

expression of dissatisfaction." *Id.* at 657, n 21. Instead, the Court examined whether counsel's performance indeed met the standard required by the Sixth Amendment. Where constitutional rights are at issue, this Court must do no less.

V

CONCLUSION

I would hold that the circumstances of this case, particularly Mr. Evelyn's failure to prepare for defendant's trial for first-degree murder, attributable in part to his disciplinary suspension, and the trial court's failure to grant defendant's timely and reasonable request for new counsel combined to deprive Mr. Mitchell his right to the effective assistance of counsel under the per se standard explained in *Cronic.*

I would further hold that the defendant's midtrial expression of satisfaction with his trial counsel was not a valid waiver or an abandonment of his Sixth Amendment rights.

Consequently, I would reverse and remand for a new trial.

CAVANAGH, J. (*dissenting*). I concur with Chief Justice MALLETT's partial dissent in this matter. I write separately only to note my disagreement with my sister BOYLE's repetitive dicta about sentencing guidelines. Within the next year we will have the Legislature's effort on sentencing guidelines, which should make my sister's continuing declamation on the subject all the more pointless.

WEAVER and KELLY, JJ., took no part in the decision of this case.