CORRIGAN, C.J.
(dissenting). Although this fact-specific case has no majority opinion and therefore lacks any jurisprudential significance, I cannot join in the opinion of Justice KELLY or Justice TAYLOR because their analyses depart from settled principles regarding ineffective assistance of counsel. Therefore, I respectfully dissent. The opinions of Justice KELLY and Justice TAYLOR conclude that defense counsel is constitutionally ineffective if counsel’s chosen strategy does not produce a favorable outcome for the defendant. Justice Kelly’s opinion relies on factual inaccuracies, omissions, and speculation and fails to observe case law from both this Court and the United States Supreme Court. Applying that law to the facts, I conclude that defendant has not overcome the strong presumption that defense counsel’s decision to not interview certain witnesses was strategic. Rather, the evidence shows that defense counsel chose not to interview the contested witnesses because their testimony was not necessary to his chosen trial strategy and could, in fact, have undermined it. Accordingly, I would affirm the decision of the Court of Appeals.
I. FACTUAL HISTORY AND PROCEDURAL POSTURE
A detailed understanding of the trial is necessary to fully evaluate whether defense counsel was ineffective.
*500 Defendant was charged with one count of first-degree criminal sexual conduct, MCL 750.520b(l)(a), and two counts of second-degree criminal sexual conduct for conduct involving his girlfriend’s nieces. Justice KELLY appears to ignore this crucial fact in her opinion: defendant was facing three counts of criminal sexual conduct, not only the one count involving the severe injury to the older sister. All the evidence presented and decisions made by defense counsel must therefore be evaluated in light of the three counts.
The prosecution proved that defendant had sexually penetrated the older sister, causing a severe injury to her vaginal wall,[1] and that defendant had also touched both sisters on a later occasion. Regarding the charge of first-degree criminal sexual conduct, the older sister testified that she originally told everyone, including the emergency room doctor who treated her, that she had been injured in a bicycle accident. She admitted that she had lied about the bicycle accident. Instead, defendant had injured her when he penetrated her. She stated that defendant told her to say she was injured in a bicycle accident.
The sisters’ father’s testimony regarding the first-degree criminal sexual conduct charge was particularly noteworthy. The father was present at the home when the older sister appeared with her injuries. He testified that, before anyone knew the extent or cause of the older sister’s injuries, defendant spontaneously insisted he had not hurt her:
Q. Okay, and when you got ready to leave for the hospital, you—you and [the defendant’s girlfriend, who was the sisters’ aunt] took [the older sister]. Is that right?
*501 A Well that young man over there come over there crying to [defendant’s girlfriend] saying I didn’t do this, I didn’t do that, and they know right off the bat that I was going to take care of it my own way.
The sisters’ father further testified:
Then when we came back—when I came back [defendant] goes—he goes running to [his girlfriend] saying that he didn’t—[the older sister’s father’s] going to think the wrong [sic, thing] about me. What do you expect I’m going to think? If something’s happened to [the older sister], I’m going to think it unless I know what happened. Then he goes crying over there to [his girlfriend] and [his girlfriend] comes over and says I got something to tell you. Bill [defendant] didn’t touch. .. Bill didn’t touch [the older sister]. Then I had [the older sister] to psy—psychology and—
Q. What are talk—
A. We’re talking about the bike accident. You brought up the subject so I’m just telling ya’.
Regarding the charges of second-degree criminal sexual conduct, both sisters testified that defendant had touched them inappropriately in a bedroom in their father’s apartment. Their testimony was corroborated by their father, who testified that defendant went alone to the part of the apartment where the girls were playing and was gone from the kitchen for about five to ten minutes.
In her opinion, Justice KELLY repeatedly insists that the “only evidence” of the three counts of criminal sexual conduct was the sisters’ statements and testimony. This is patently false. The prosecution presented no fewer than eight witnesses during the two-day trial, including two physicians, the sisters, a friend of the older sister (who corroborated the older sister’s testimony), the mother of the older sister’s friend (who also corroborated the older sister’s testimony), the sisters’ *502 father (whose testimony was outlined above), and the officer who initially investigated the complaints. When discussing the evidence presented at trial, the prosecution should be afforded every supportive inference that can be drawn from this evidence. Justice KELLY, however, simply denies that evidence existed at all. This selective recitation of the facts is misleading.
The defense theory at trial was twofold: (1) that defendant did not commit the offenses and had no knowledge of them, and (2) that the older sister habitually lied and could not be trusted. The defense presented three witnesses.
The first was the sisters’ grandfather and defendant’s girlfriend’s father. He lived at the house where the first-degree criminal sexual conduct occurred. He testified that defendant was never alone with the older sister and that the bicycle in question was like a unicycle, with the front broken off. He testified that he saw the older sister playing with the bicycle on previous occasions, although he was not home at the time of the accident. The older sister’s brother, however, told him about the bicycle accident. The grandfather testified that the older sister had never told him about any sexual abuse and that she never acted as though she was afraid of defendant or did not like him.
The second defense witness was the older sister’s uncle and defendant’s girlfriend’s brother. He also testified that defendant was never alone in the house and that, to his knowledge, defendant never watched the older sister alone. Moreover, the older sister never acted frightened or uncomfortable around defendant and she never mentioned any abuse or inappropriate behavior to him. Although he had not seen the bicycle accident, the older sister’s brother also told him about *503 it. He saw the older sister after she was injured and knew she was being transported to the hospital. He also saw defendant after the older sister went to the hospital and did not remember defendant having any blood on his shirt.
The last witness was the older sister’s aunt and defendant’s girlfriend at the time of the offense. She and defendant had a child together, for whom defendant paid child support. She testified that defendant was never alone in the house and that it was “absolutely impossible” for defendant to have ever been alone with the older sister. Further, although she had not witnessed the bicycle accident, she did accompany the older sister to the hospital. The older sister’s brother also told her about the bicycle accident. Further, defendant’s clothes had not been disturbed and she did not see blood on any of his clothing. Finally, she testified that the older sister had never come to her about any abuse or inappropriate behavior and that the girl liked defendant and always wanted to be around him.
In his closing statement, defense counsel argued that defendant did not commit the offenses and that the older sister, for whatever reasons, had lied. He pointed out numerous inconsistencies in the girl’s testimony, including her insistence that she had been eight months pregnant and had the baby taken out of her at the hospital. Finally, defense counsel also made strategic use of the fact that none of the defense witnesses had witnessed the bicycle accident. He noted that the witnesses had all heard about the accident from the older sister’s brother, rather than from the older sister herself. The jury convicted defendant on all counts.
*504 II.DISCUSSION
A. THE LAW REGARDING INEFFECTIVE ASSISTANCE OF COUNSEL
I agree with Justice KELLY that in People v Pickens, 446 Mich 298; 521 NW2d 797 (1994), this Court adopted the standard of ineffective assistance of counsel set forth in Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To prove ineffective assistance, a defendant must show that his attorney’s performance fell below an objective standard of reasonableness and that, but for counsel’s errors, there is a reasonable probability that the result of the proceeding would have been different. “Reasonable probability” is defined as “a probability sufficient to undermine confidence in the outcome.” Strickland, supra at 694 (emphasis added).
Unfortunately, Justice KELLY gives only lip service to the strong presumption that counsel’s actions were sound trial strategy, and that “every effort [must] be made to eliminate the distorting effects of hindsight . ...” Id. at 689. See also People v Toma, 462 Mich 281, 302; 613 NW2d 694 (2000) (“[A] defendant must overcome the strong presumption that his counsel’s action constituted sound trial strategy under the circumstances.”); People v Hoag, 460 Mich 1, 6; 594 NW2d 57 (1999) (the law affords a strong presumption that counsel’s actions constituted trial strategy). In evaluating a claim of ineffective assistance, “[j]udicial scrutiny of counsel’s performance must be highly deferential” and should refrain from second-guessing counsel’s chosen trial strategy. Strickland, supra at 689 (emphasis added). Counsel’s performance must be evaluated from counsel’s perspective at the time of the alleged error and in light of the circumstances. Id. This deferential stan *505 dard of review exists because “it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.” Id.
B. INVESTIGATION AND STRATEGY
Rather than apply this deferential standard of review, Justice Kelly has twisted the law to place the burden on the defense counsel to defend his chosen strategy. In fact, Justice KELLY goes further and holds that, because defense counsel’s strategy was not ultimately successful, it cannot even be considered reasonable. Ante at 486. In so holding, Justice KELLY completely ignores counsel’s testimony in the hearing held pursuant to People v Ginther, 390 Mich 436; 212 NW2d 922 (1973). Justice KELLY concludes that “[counsel here was not] disregarding one possible, alternate theory of defense in favor of a better one . . ..” Ante at 492. This conclusion is not supported by the record evidence.
Defendant’s trial counsel, David I. Goldstein, testified at the Ginther hearing. Goldstein expended twice his normal resources on this case: although he customarily used only one investigator for each case, he assigned two investigators to defendant’s case because the witnesses were so uncooperative. Justice KELLY’s assertions that counsel had information “readily available” to him and “failed to contact most of the persons whose names defense had provided for his own defense,” ante at 487, are misleading and unfounded. Goldstein testified at length regarding his difficulty in finding any defense witnesses who would cooperate. In fact, as stated below, Goldstein provided documentary evidence of his repeated attempts to contact potential defense witnesses and the many ways those attempts were rebuffed or ignored. He stated that the investigators *506 finally interviewed the older sister’s grandfather, uncle, and defendant’s girlfriend, but only after considerable effort. The witnesses, particularly defendant’s girlfriend, would not return calls or keep scheduled appointments. He offered physical exhibits, including interviews notes and office records, to support this testimony. The defense witnesses defense counsel was able to contact even ignored a trial subpoena, forcing him to obtain a material witness warrant to ensure their presence at trial. Defense counsel could not force the possible defense witnesses to cooperate; he was limited by the witnesses’ marked refusal to cooperate.
The defense theory was that defendant did not commit the crime. At the time of the trial, Goldstein did not believe that establishing the accident was going to be a problem because the older sister had acknowledged the bicycle accident. Until the trial began, Goldstein was not aware that the older sister was denying the bicycle accident:
A. I didn’t think we needed to prove that the accident occurred because I didn’t think the occurrence of the accident was in dispute.
Q. Did you, did, the nature of the injury was in dispute, however? Wasn’t it?
A. The nature of the injury, but not the accident itself.[2]
*507 Goldstein testified that he did not consider it important to the defense to obtain eyewitnesses to the accident because of the older sister’s admission and because “a layperson observing an accident can’t testify as to the extent of injuries.” He stated that he already had witnesses to testify about the amount of blood:
[P]roving the existence of the... accident was not significant. We had [the uncle]. We had the, we had the statement of the girl. [The uncle] saw the blood. Nobody was disputing the bleeding. So proving that was not... a critical issue. The critical issue was relating that to the, to the charge... .
And a .. . lay witness can’t do that.
Goldstein explained that, given the anticipated testimony of Dr. Bond of a credible report of sexual abuse, he did not feel it was necessary to interview or call eyewitnesses to the bicycle accident:
If the doctors are going to testify that the bicycle accident did not cause that injury, what’s the point of proving that there was an accident?
He explained that he made the tactical decision to not contest the medical experts because he could not find any medical experts who would testify for the defense without having examined the older sister at the time of the injury. Justice KELLY implies, ante at 488 n 7, that the fact that defense counsel was unable to find any doctors to testify should somehow have prompted some further inquiry regarding the cause of the older sister’s injuries. This mischaracterizes Goldstein’s testimony at the Ginther hearing. Goldstein did not testify that he could not find a doctor who could conclusively deter *508 mine the cause of the older sister’s injuries; rather, he testified that he could not find any doctor who could form any opinion because the doctors had not had an opportunity to personally examine the older sister. I fail to understand how the fact that no doctor would testify without personally examining the older sister should have prompted further inquiry in the cause of the accident on the part of defense counsel. Rather, because he could not find any medical experts to testify, Gold-stein was unable to choose any trial strategy that involved contradicting the prosecution’s medical experts.
Further, Goldstein testified that one of the defense strategies was to argue that the older sister “had a habit of making things up.” Thus, when the prosecutor opened with the statement that the older sister was now denying there was an accident, he felt it strengthened the defense:
But you know,. .. since our position was the girl was a liar, I welcomed [the prosecutor] getting up and saying that the girl had lied.
He testified:
A. Our, the tactical decision was made that our main thrust was that this girl was a liar. That if she was, if she was in fact sexually assaulted it wasn’t by Bill Grant.
Q. And would have trying to attack the conclusions of the doctor or fight about a bicycle accident, would that have detracted from the defense that the victim was a liar?
A. It could of, it could have. I mean obviously I can’t read a jury’s mind. But it could have.
Q. But in your mind, it would have been a tactical decision to pick one defense and keep hitting that rather than a shotgun?
A. Well, our defense all along was, we don’t know if she was sexually assaulted or not. But if she was, it wasn’t Bill *509 Grant. You know, that we, that we didn’t know whether she was or she wasn’t because she had, she had a tendency to he. But in any case, it wasn’t Bill Grant.
Thus, he specifically considered the effect of the older sister’s contradictory testimony and chose, as a matter of strategy, to highlight the inconsistencies and use it to the defense’s advantage.
Goldstein also testified that he knew of the existence of the mother of the boys who allegedly witnessed the bicycle accident before trial and knew that she had witnessed the older sister’s injury. He stated, however, that he was not aware that the boys claimed they had witnessed a bicycle accident until he received a letter from their mother after the trial. He explained that he did not interview or call the boys’ mother because, as far as he understood it, her testimony was that she saw the bleeding, and he already had two witnesses who testified they saw the bleeding. Further, Goldstein stressed that because the defense theory was that even if the older sister had been sexually assaulted, it was not by defendant, so establishing the existence of a bicycle accident was not crucial.
In short, defense counsel explained that: (1) he strategically chose to focus on two themes—that whatever had happened to the older sister, defendant was not involved, and that the older sister was a liar; (2) he made the further strategic decision not to pursue a theory that would have required presenting evidence regarding the existence of the bicycle accident, on the grounds that the conflicting stories strengthened the theory that the older sister was a liar and could possibly distract the jury from his chosen trial strategy; and (3) he chose to not interview the contested witnesses because their testimony was either irrelevant to his de *510 fense (whether the bicycle accident had actually happened) or cumulative (the extent of the older sister’s injuries). Defense counsel further testified that he chose his defense strategy after considering that he could not present any medical testimony to rebut the prosecution’s medical testimony that the older sister’s injuries were consistent with sexual assault.
It is clear that defense counsel did not interview the contested witnesses because, at the time he was preparing for trial, he had no reason to think those witnesses would enhance his chosen trial strategies. Further, it is clear that defense counsel did not interview the witnesses during the trial because he believed that the older sister’s testimony that she had lied about the bicycle accident only strengthened his defense.
Justice Kelly’s failure to acknowledge such trial strategy is puzzling. Justice KELLY also fails to acknowledge or apply the deferential standard required by Strickland. Rather than shunning hindsight and reviewing counsel’s actions from counsel’s perspective at the time of the alleged error in light of all the circumstances, Justice KELLY summarily concludes that defense counsel was ineffective because his strategy did not prove successful. This holding cannot be squared with our Sixth Amendment jurisprudence. “[T]he Sixth Amendment guarantees a range of reasonably competent advice and a reliable result. It does not guarantee infallible counsel.” People v Mitchell, 454 Mich 145, 171; 560 NW2d 600 (1997).
Further, Justice KELLY gives only lip service to the fact that defense counsel was not preparing for a trial in which the sole count was the first-degree criminal sexual conduct charge. Rather, defense counsel had to prepare a defense that addressed all three charges against defendant. He was repeatedly frustrated in his *511 investigatory efforts by lack of cooperation from the ostensible witnesses. He did not have the benefit of perfect hindsight, nor did he have unlimited time and resources. Rather, he had to make his own “reasonable professional judgments” regarding “the limitations on investigation,” including the “reasonable decision that makes particular investigations unnecessary.” Strickland, supra at 690-691.
C. REASONABLE PROBABILITY
In addition to ignoring the deferential standard of judicial review of trial strategy involving the multiple charges against defendant, Justice KELLY also ignores the definition of “reasonable probability.” “Reasonable probability” does not mean that a majority of this Court finds the testimony of the contested witnesses compelling. Rather, as explained above, “reasonable probability” means a probability sufficient to undermine confidence in the outcome.[3] Defendant has simply presented what could have been an alternate trial strategy; he has not met his burden of demonstrating a sufficient probability that the actual strategy chosen by his counsel actually undermined confidence in the outcome of his trial.
Further, any determination of “reasonable probability” must take into account the entire record, including all the evidence produced regarding the three counts against defendant. Given the sisters’ father’s devastating testimony that defendant spontaneously protested his innocence before anyone knew the extent or cause of the older sister’s injuries, and given the corroborated testimony of both sisters regarding the second-degree *512 criminal sexual conduct charges, one cannot conclude that defense counsel’s decision not to pursue the bicycle accident issue with exhausting detail undermines confidence in the outcome.
After reviewing the full record, I cannot conclude that defense counsel’s actions constituted anything less than sound trial strategy. Applying the correct standards of review and placing the burden on defendant reveals that defendant has not demonstrated that defense counsel committed any error at all, let alone an error that would undermine confidence in the outcome.
HI. RETRIAL
I also note that, if there is a retrial, the evidence regarding the bicycle accident that Justice KELLY finds so compelling will be subject to intense scrutiny, given the lack of any coherent testimony regarding the alleged bicycle accident.
In the characterizations of the testimony regarding the alleged bicycle accident, Justice KELLY willfully omits the many inconsistencies that arose during the testimony. A full review of the testimony, as outlined below, demonstrates that the testimony was conflicting, confusing, and actually undermined the testimony of the defense witnesses at trial. Had defense counsel presented such testimony at trial, the jury would have been presented with five defense witnesses, two of whom contradicted the testimony of the other three. I fail to see how the decision to present a coherent, unified defense theory to the jury constitutes ineffective assistance.
A. THE INITIAL TESTIMONY REGARDING THE BICYCLE ACCIDENT
After the verdict was rendered, but before sentencing, new defense counsel moved for a new trial on the *513 basis of newly discovered evidence. The new evidence presented at the motion relevant to this appeal was that the sisters’ cousins witnessed the bicycle accident that defendant had alleged caused the older sister’s injuries. The cousins’ testimony, however, was confusing and contradictory.
At the time of the first-degree sexual criminal conduct offense, the boys were six and eight. Their mother testified that she had not witnessed the bicycle accident, but that her children had. She testified that she was in the bathroom with defendant’s girlfriend helping the older sister after she was injured and acknowledged that defendant’s girlfriend would have known of her presence and made the same observations. The cousins’ mother also stated that the rest of the family knew she was at the house on the day of the accident and also knew that her children were there. She testified that she was aware of the trial and stated that she told defendant’s mother about her presence in the bathroom and her children’s presence at the accident on the second day of the trial.
The older cousin testified that he saw the older sister’s bicycle accident and saw her get injured. He testified that, after the accident, the older sister did not cry or scream and walked by herself up to the house, where defendant’s girlfriend took her into the bathroom. He testified that the older sister was wearing light blue jeans, but that the jeans turned dark after the accident because of all the blood. He testified that the older sister got hurt on the bicycle handles. He specified that he was at the bottom of the hill when the older sister got hurt and that no one was at the top of the hill. He testified that defendant’s girlfriend would have known that he was at the house and that he was also playing with the bicycle when the accident occurred. He *514 also stated repeatedly that he never told his mother or anyone else about the accident and insisted that if his mother said otherwise, she would be wrong.
The younger cousin testified that he knew he was at the hearing to testify about the bicycle accident, although he insisted no one told him that. He stated that the front wheel on the bicycle was broken off, but that the handlebars were intact. He testified that he saw the older sister running down the hill with the bicycle and that she fell on some metal when she let go of it and got hurt in her private part. The younger cousin testified that after she got hurt, the older sister just got up and walked to the house. After repeated questioning, he testified that he specifically remembered that the older sister had been wearing blue sweat pants, and not jeans, and that the sweat pants were torn in the front. The younger cousin also testified that, contrary to the older sister’s uncle’s testimony at trial, the uncle was not at the home on the day the accident happened and that, if he said differently, the uncle would be wrong. Thus, the boy’s testimony contradicted that of one of the key defense witnesses at trial. The younger cousin testified that defendant’s girlfriend and the older sister’s grandfather would have known he was at the house on the day of the accident and that they all knew he was with the older sister when the accident happened. He also testified both that he had told someone about the bicycle accident a couple minutes after it happened and that he never told anyone about the bicycle accident at all.
After the hearing, the judge denied the motion for new trial and sentenced defendant to fifteen to forty years for the first-degree criminal sexual conduct count and ten to fifteen years for the two counts of second-degree criminal sexual conduct.
*515 B. SUBSEQUENT TESTIMONY REGARDING THE BICYCLE ACCIDENT
The cousins testified again at the Ginther hearing, and their testimony at the Ginther hearing contradicted much of the testimony given previously at the hearing regarding the motion for a new trial.[4]
The older cousin testified that the bicycle was like a unicycle and that it was not possible to ride it. Instead, people ran behind the bicycle holding the handlebars. Contrary to his testimony at the motion for a new trial, the older cousin testified, “But I didn’t see her get hurt on the hike, though.” (Emphasis added.) He further testified, “I didn’t see the bike part hit her, but I knew where she was hurt at.” He also testified that the older sister did not walk up the hill as he had previously testified, but instead that her mother and an aunt went down the hill and got her. The older cousin testified that the hill was over fifty feet long and that he was at the top of the hill at the time of the accident, not at the bottom of the hill as he had previously testified. He testified that he talked to his mother about the accident shortly after it happened, but later said he didn’t remember whether he talked to her or not. Finally, he also testified that on the morning of the hearing he was talking with his mother and grandmother “about how the jury screwed up.” He stated:
Q. Okay. You chatted with somebody this morning about this?
*516 A. Just about—well, rumor—well, what I heard about the jury and how they messed and that was about it this morning.
Q. Your mom told you what this was all about?
A. Yeah.
Q. Okay. She told you why you were here?
A. Um hm.
Q. Yes?
A. Yes.
Q. Okay. And she told you what to say?
A. No.
Q. Okay. What did she tell you?
A. She told us that we’re going here to see if we can help Bill. [Emphasis added.]
The younger cousin testified, contrary to his brother’s testimony, that both he and defendant actually rode the bicycle the day of the accident. This testimony placed defendant at the scene of the injury and directly contradicted with the testimony of all of the defense witnesses at trial, who had testified that defendant was not at the scene when the older sister was injured. He testified that the bicycle had both a seat and pedals, again contrary to his brother’s testimony. He testified that, contrary to his previous testimony, the older sister was riding the bicycle and not running behind it. He stated that he was at the top of the hill with his brother at the time of the accident, and that the older sister was injured by the handlebars on the bicycle, not by the pile of metal at the bottom of the hill as he had previously testified:
Q. Okay. So [the older sister] didn’t run into a pile of metal at the bottom of the hill?
A. No.
Q. That didn’t happen?
A. Right. That did not happen.
*517 Finally, when the younger cousin was questioned about the older sister’s clothes, the following exchange took place:
Q. [The older sister] was wearing clothes?
A. Yes.
Q. Do you remember if she had on long pants or short pants?
A. She had on long pants.
Q. Okay.
A. And I only know that they were blue. I don’t know if they were sweat pants or jeans. I have no idea.
Q. What made you say that about sweat pants or jeans?
A. Because she had a pair of sweat pants and she had a pair of jeans and I know they were both blue.
Recall that, at the motion for a new trial, the younger cousin had insisted that the older sister was wearing sweat pants and not jeans, and that he knew the difference between the two. He was the only person to testify that the older sister was not wearing jeans. His spontaneous statement that he no longer knew if the older sister was wearing sweat pants or jeans prompted the following exchange:
Q. Okay. Did your mom or anybody in your family talk to you about what you were going to testify to today?
A. Only my mom.
Q. Okay. What did your mom talk to you about?

A. She said I was testifying to see if I could get Grant-Bill Grant out.

Q. Get Bill Grant off?
A. Um hm. [Emphasis added.]
Thus, the boys’ testimony gave no coherent explanation of whether they actually saw or remembered the alleged accident, how the alleged accident occurred, *518 where the alleged accident occurred, or who was present when the alleged accident occurred. Given the numerous inconsistencies in the boys’ testimony regarding the bicycle accident and the boys’ testimony that they were trying to “help” defendant or “get [defendant] out,” the boys’ testimony on retrial will be subject to impeachment. Given the inherent problems in using this testimony, it will be difficult on retrial to establish with any certainty any details surrounding the alleged bicycle accident.
IV CONCLUSION
In her opinion, Justice KELLY ignores both the facts and the law. Rather than placing the burden on defendant to demonstrate the ineffective assistance of his counsel and reviewing defendant’s claim with the strong presumption that counsel’s actions constituted sound trial strategy, the opinions of both Justice KELLY and Justice TAYLOR conclude, in hindsight, that, because those justices would have presented a different strategy, counsel was ineffective. This is an unprecedented and unwarranted departure from our Sixth Amendment jurisprudence. Application of the law to the facts of this case compels the conclusion that counsel thoughtfully chose a trial strategy and pursued that strategy. Counsel’s contested actions were all deliberately chosen to execute counsel’s chosen strategy. Defendant has failed to demonstrate any error by his counsel, let alone one that undermined confidence in the outcome. Rather, all defendant has shown is an unfavorable result. Until today, an unfavorable result was not enough to demonstrate ineffective assistance of counsel. With all respect due the opinions of Justice KELLY and Justice TAYLOR, I believe it still is not. Accordingly, I would affirm the decision of the Court of Appeals.
*519 Weaver and Young, JJ., concurred with Corrigan, C.J.

 The older sister underwent surgery under general anesthesia that required twenty stitches to repair an episiotomy-like rip.

 Justice Kelly relies on a police report to prove that Goldstein knew that the older sister had made inconsistent statements regarding the nature of her injuries. This police report is not in the record before us. Justice Kelly’s assertions regarding this missing report are baffling. Justice Kelly also repeatedly insists that defense counsel’s access to two doctor’s reports should have prompted further inquiry. These reports are also not in the record before us. If the missing police report and the other missing reports identified by Justice Weaver are so crucial to Justice Kelly’s determination of this case, the proper course is not to “infer” the contents of the missing reports, but to remand to the trial court to *507 reconstruct those reports. Justice Kelly refuses to remand to reconstruct these reports; instead, she simply bases her analysis on nothing more than mere speculation.

 Justice Kelly attempts to recharacterize this standard as “beyond a reasonable doubt.” Nowhere do I argue, however, that the standard is “beyond a reasonable doubt.”

 Justice Kelly’s characterization of the trial court’s decision at the Ginther hearing is also misleading. The trial court gave a very detailed decision, finding not that the boys were unable to remember clearly at the time of the Ginther hearing, but that the court did “not believe that the witnesses, Mr. Goldstein is alleged to have failed to interview, would have been of assistance to the Defendant and would have directly exculpated the Defendant on the CSC-i offense.”